R. Rex Parris (SBN 96567)
  rrparris@parrislawyers.com
Kitty K. Szeto (SBN 258136)
  kszeto@parrislawyers.com
John M. Bickford (SBN 280929)
  jbickford@parrislawyers.com
Ryan A. Crist (SBN 316653)
  rcrist@parrislawyers.com
**PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:    (661) 949-2595
Facsimile:    (661) 949-7524

Eric Rouen (SBN 242341)
  rouenlaw@att.net
**THE DOWNEY LAW FIRM**
9595 Wilshire Blvd., Suite 900
Beverly Hills, California 90212
Telephone:    (213) 291-3333
Facsimile:    (610) 813-4579

Attorneys for Plaintiff and the Putative Class

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| CHARLES BATES, an individual, on behalf of himself and all members of the putative class;<br><br>Plaintiff,<br><br>v.<br><br>LEPRINO FOODS COMPANY, a Colorado Corporation; LEPRINO FOODS DAIRY PRODUCTS COMPANY, a Colorado Corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.:   2:20-CV-00700-AWI-BAM<br><br>**CLASS ACTION**<br><br>**PLAINTIFF CHARLES BATES'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:          August 29, 2022<br>Time:         1:30 p.m.<br>Courtroom:  #2, 8th Floor<br>Judge:        Anthony W. Ishii<br><br>Complaint Filed:  February 28, 2020<br>Trial Date:        None Set |

## TABLE OF CONTENTS

PAGE(S)

**TABLE OF AUTHORITIES** ........................................................................................... iv

**INTRODUCTION** ......................................................................................................... 1

**THE FACTS** ............................................................................................................... 2

    **A.**    **Background on the Tracy facility and the putative class members.** ............................ 2

    **B.**    **Leprino requires its hourly employees to come in early and unfairly rounds this time against them to the nearest 15 minute increment.** ........................................ 3

        1.    Leprino requires employees to clock-in no more than seven minutes before the start of their shifts and warns them that being one-minute late is grounds for discipline. ............................................................................................... 3

        2.    Even though Leprino records employees' actual punch times, Leprino's payroll system ignores the actual punch times and artificially rounds the clock-in and clock-out times to the nearest 15 minute increment. .......................................... 6

        3.    Leprino's time and payroll data show that Leprino's rounding policy confirms that underpays its employees in nearly every pay period. ................................. 6

    **C.**    **The seven-minute window is still not enough time to complete Leprino's other pre-shift requirements.** ................................................................................... 7

        1.    All employees must put on Leprino-mandated uniforms and protective equipment prior to the start of their shifts. ................................................................. 7

        2.    Leprino also requires the class members to wash their hands and sanitize before the start of their shift and the pre-shift meeting. ............................................. 8

        3.    These pre-shift requirements result in a line of employees trying to clock-in, seven minutes before the start of the employees' shifts. ................................... 9

    **D.**    **Leprino's facially invalid rounding policy causes late lunch breaks because it ignores the first seven minutes before the start of the scheduled shifts.** ........................... 10

    **E.**    **Leprino requires its employees to remain "on-call" during meal and rest periods.** ..... 11

i

## TABLE OF CONTENTS

**PAGE(S)**

    **1.**    Leprino requires its employees to watch the production line, even during meal and rest breaks. ............................................................................................. **12**

    **2.**    Leprino requires employees to respond to their supervisors at all times. ................ **13**

    **3.**    Leprino issues radios to its employees and expects them to respond at all times. ... **14**

    **4.**    Employees hear their names called on Leprino's public announcement, intercom, and radio systems during breaks. ................................................................... **15**

    **5.**    Leprino incentivizes its supervisors and foremen to keep the machines running, even if it means that employees have to work through their breaks. ...................... **16**

  **F.**    **Leprino confirms there is nothing about the nature of the work that prevents Leprino from scheduling more employees to prevent breaks.** ........................................ **18**

**LEGAL STANDARD** ............................................................................................................ **18**

**ARGUMENT** ........................................................................................................................ **19**

  **I.**    **ALL FOUR RULE 23(A) PREREQUISITES ARE MET.** ............................................ **19**

    A.    The class is sufficiently numerous to make joinder impracticable. ......................... **19**

    B.    There are common questions that will drive the resolution of the litigation. .......... **19**

        1.    Common questions will drive the resolution of Plaintiff's wage claims against Leprino for improper rounding. ...................................................... **21**

        2.    Common questions will drive the resolution of Plaintiff's timely meal break claims in light of *Donohue*. .............................................................. **22**

        3.    Common questions will drive the resolution of Plaintiff's "on-call" theory. .................................................................................................... **25**

        4.    Common questions will drive the resolution of Plaintiff's "on duty" meal period claim. ................................................................................. **28**

    C.    Plaintiff's claims are typical of the claims and defenses of the class ...................... **29**

    D.    Plaintiff and his counsel are adequate. ................................................................. **30**

  **II.**    **RULE 23(B)(3) IS SATISFIED.** ........................................................................... **30**

ii

1

**TABLE OF CONTENTS**

2

**PAGE(S)**

3          A.      Common questions predominate over any purported individualized issues.**........... 30**

4          B.      Class treatment is superior to litigating more than hundreds of individual cases.**.... 32**

5     **CONCLUSION**.................................................................................................................. 33

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF CHARLES BATES'S MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**PAGE(S)**

<u>Cases</u>

*Abdullah v. U.S. Sec. Assoc., Inc.*,
  731 F.3d 952 (9th Cir. 2013) ...........................................................................20, 29, 30

*Albert v. Aurora Behavioral Health Care*
  241 Cal.App.4th 388 (2015) ..................................................................................24

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013).......................................................................................19, 32

*Andrews v. Am. Tel. & Tel. Co.*,
  95 F.3d 1014 (11th Cir. 1996) ..................................................................................31

*Antemate v. Estenson Logistics, LLC*,
  No. CV 14–5255 DSF (RZx), 2015 WL 3822267 (C.D. Cal. June 15, 2015)...................28

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) ..................................................................................26

*Augustus v. ABM Sec. Servs., Inc.*,
  2 Cal. 5th 257 (2016).......................................................................22, 25, 26, 28

*Ayala v. U.S. Xpress Enterprises Inc.*,
  No. EDCV 16-137-GW(KKx), 2017 WL 3328087 (C.D. Cal. July 27, 2017) ...............27, 28

*Bateman v. Am. Multi-Cinema, Inc.*,
  623 F.3d 708 (9th Cir. 2010) ...........................................................................18, 30

*Bebber v. Dignity Health*
  2021 WL 1187268 (E.D. Cal., Mar. 30, 2021) ..............................................................21

*Benton v. Telecom Network Specialists, Inc.*
  220 Cal.App.4th 701, 726(2013) ..............................................................................24

*Bradley v. Networkers Int'l, LLC*,
  211 Cal. App. 4th 1129 (2012) ...........................................................................1, 24, 33

# TABLE OF AUTHORITIES

**PAGE(S)**

<u>Cases</u>

*Brinker Rest. Corp. v. Superior Court*,
   53 Cal. 4th 1004 (2012) ............................................................................... *passim*

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ..................................................................................30

*Campbell v. Vitran Express Inc.*,
   No., CV 11–5029 RGK (SHx), 2015 WL 7176110 (C.D. Cal. Nov. 12 2015) ......................28

*Cooper v. S. Co.*,
   390 F.3d 695 (11th Cir. 2004) ................................................................................31

*Donohue v. AMN Services, LLC*
   (2021) 11 Cal.5th 58 ......................................................................21, 22, 23, 32

*Dukes v. Wal-Mart Stores, Inc.*,
   603 F.3d 571 (9th Cir. 2010) ..................................................................................29

*Edwards v. First Am. Corp.*,
   289 F.R.D. 296 (C.D. Cal. 2012) ...........................................................................19

*Eisen v. Carlisle & Jacquelin*,
   391 F.2d 555 (2d Cir. 1968) ....................................................................................1

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012) ...........................................................................20

*Faulkinbury v. Boyd Associates*,
   216 Cal.App.4th 237 ...............................................................................................24

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ...............................................................................................18

*Ghazaryan v. Diva Limousine, Ltd.*,
   169 Cal. App. 4th 1524 (2008) .................................................................................1

v

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Giles v. St. Charles Health Sys., Inc.*,
   294 F.R.D. 585 (D. Or. 2013)..................................................................................30

*Gonzales v. Arrow Fin. Servs. LLC*,
   489 F. Supp. 2d 1140 (S.D. Cal. 2007)...................................................................19

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) ....................................................................................................1

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)............................................................................20, 31

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992)...................................................................................29

*Herskowitz v. Apple, Inc.*,
   301 F.R.D. 460 (N.D. Cal. 2014)..............................................................................30

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   202 F.R.D. 12 (D.D.C. 2001) ...................................................................................20

*In re Nassau Cnty. Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006) .....................................................................................31

*In re Rubber Chem. Antirust Litig.*,
   232 F.R.D. 346 (N.D. Cal. 2005)..............................................................................19

*In re Taco Bell Wage and Hour Actions*
   Case No. 1:07cv1314 LJO DLB, 2012 WL 5932833 (E.D. Cal. 2012) ..................24

*Jaimez v. DAIOHS USA, Inc.*
   181 Cal.App.4th 1286 (2010) .............................................................................25, 28

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014)...................................................................................20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**PAGE(S)**

<u>Cases</u>

*Kamar v. Radio Shack Corp.,*
   254 F.R.D. 387 (C.D. Cal. 2008) ................................................................32

*Levya v. Medline Indus., Inc.*
   716 F.3d 510 (9th Cir. 2013) ......................................................................31

*Lewis v. First Am. Title Ins. Co.,*
   265 F.R.D. 536 (D. Idaho 2010) .................................................................31

*Linder v. Thrifty Oil Co.,*
   23 Cal. 4th 429 (2000) ................................................................................19

*Meyer v. Portfolio Recovery Assocs.,*
   707 F.3d 1036 (9th Cir. 2012) ....................................................................20

*Morillion v. Royal Packing Co.,*
   22 Cal. 4th 575 (2000) ..........................................................................21, 26

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014) ................................................................20, 29

*Patel v. Trans Union, LLC,*
   308 F.R.D. 292 (N.D. Cal. 2015) ................................................................31

*Perez v. Leprino Foods Co.,*
   No. 117CV00686AWIBAM, 2021 WL 53068 (E.D. Cal. Jan. 6, 2021) ..................2, 27, 32

*Phelps v. 3PD, Inc.,*
   261 F.R.D. 548 (D. Or. 2009) .....................................................................30

*Richmond v. Dart Indus., Inc.,*
   29 Cal. 3d 462 (1981) ...................................................................................1

*Safeway, Inc. v. Superior Court of Los Angeles County*
   238 Cal.App.4th 1138, 1159 (2015) ...........................................................24

# TABLE OF AUTHORITIES

**PAGE(S)**

<u>**Cases**</u>

*Sav-on Drug Stores, Inc. v. Superior Court,*
    34 Cal. 4th 319, 326 (2004) ...................................................................................19, 30

*See's Candy Shops, Inc. v. Superior Court*
    210 Cal.App.4th 889 (2012) ...........................................................................................21

*Selk v. Pioneers Memorial Healthcare District*
    2014 WL 12729167 (S.D. Cal., Apr. 22, 2014) ..............................................................21

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010) .......................................................................................................18

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) .........................................................................................30

*Troester v. Starbucks Corp.*
    5 Cal. 5th 829 (2018) .....................................................................................................21

*United Steel Workers Int'l Union v. ConocoPhillips Co.,*
    593 F.3d 802 (9th Cir. 2010) .........................................................................................19

*Valentino v. Carter-Wallace, Inc.,*
    97 F.3d 1227 (9th Cir. 1996) .........................................................................................33

*Vasquez v. Leprino Foods*
    No. 117CV00796AWIBAM, 2020 WL 1527922 (E.D. Cal. Mar. 31, 2020)..........................2, 26, 27, 32

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) .................................................................................18, 19, 20, 31, 32

*Wang v. Chinese Daily News, Inc.,*
    737 F.3d 538, 545 (9th Cir. 2013) .............................................................................20, 30

*Wolin v. Jaguar Land Rover N. Am., LLC,*
    617 F.3d 1168 (9th Cir. 2010) .......................................................................................33

PLAINTIFF CHARLES BATES'S MOTION FOR CLASS CERTIFICATION

1

## TABLE OF AUTHORITIES

2

**PAGE(S)**

3 **Statutes**

4 California Labor Code § 226.7 ...............................................................................22, 26

5

6 **Other Authorities**

7 American Law Institute, Principles of Law of Aggregate Litigation (2009) ................................20

8 Charles Alan Wright, et al., Federal Practice & Procedure § 1778 (2d ed. 1986) ......................31

9 Charles Alan Wright, et al., Federal Practice & Procedure § 1779 (3d ed. 2005) ......................33

10 Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97 (2009) ...20

11 William Rubenstein et al., Newberg on Class Actions (5th ed. 2011).............................................19, 20, 30

12

13 **Rules**

14 Fed. R. Civ. Proc. 23(a) ...............................................................................................19, 30

15 Fed. R. Civ. Proc. 23(a)(1) ...............................................................................................19

16 Fed. R. Civ. Proc. 23(a)(2) ...............................................................................................19, 20

17 Fed. R. Civ. Proc. 23(a)(3)...............................................................................................29

18 Fed. R. Civ. Proc. 23(a)(4)...............................................................................................30

19 Fed. R. Civ. Proc. 23(b)...............................................................................................19, 30

20 Fed. R. Civ. Proc. 23(b)(3) ...............................................................................................1, 19, 32

21 Fed. R. Civ. Proc. 23(c)(4)...............................................................................................31

22

23

24

25

26

27

28

1

## **INTRODUCTION**

2    "Class actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*,

3    452 U.S. 89, 99 (1981).  " 'By establishing a technique whereby the claims of many individuals can be

4    resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides

5    small claimants with a method of obtaining redress for claims which would otherwise be too small to

6    warrant individual litigation.' "  *Richmond v. Dart Indus., Inc.*, 29 Cal. 3d 462, 469 (1981) (quoting *Eisen*

7    *v. Carlisle & Jacquelin*, 391 F.2d 555, 560 (2d Cir. 1968)).  This is especially true in the wage-and-hour

8    context where California has adopted a public policy that "supports the use of class actions to enforce

9    California's [wage-and-hour laws] for the benefit of workers."  *Bradley v. Networkers Int'l, LLC*, 211 Cal.

10   App. 4th 1129, 1141 (2012); *see also Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal. App. 4th 1524, 1538

11   (2008) (recognizing "it is no accident that wage and hour disputes . . . routinely proceed as class actions"

12   (internal quotation marks omitted)).

13   Here, Plaintiff Charles Bates ("Plaintiff") seeks to certify the following class against his former

14   employer, Defendants Leprino Foods Company and Leprino Foods Dairy Products Company (collectively

15   "Leprino"), under Federal Rule of Civil Procedure 23 (b)(3):

16              All non-exempt hourly workers who are currently employed, or formerly

17              have been employed, as non-exempt hourly employees at Leprino's Tracy

18              plant in Tracy, California, at any time within four years prior to the filing

19              of the original complaint until the date the Court grants certification.

20   Certification is appropriate because each of Plaintiff's theories of classwide recovery is based on

21   an alleged classwide policy or practice that directly conflicts with, or has the logical and practical effect of

22   violating, California's wage-and-hour laws.  *See Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004,

23   1033 (2012) (recognizing that claims involving "uniform policy consistently applied to a group of

24   employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable

25   for class treatment").  Indeed, several of Leprino's uniform policies and practices are facially unlawful and

26   deprive the class members of timely and compliant breaks.  The Court should therefore grant Plaintiff's

27   motion and certify the class.

28   Notably, this is another motion for class certification regarding Leprino's unlawful policies and

1

practices in California.  Two of the prior motions for class certification were granted as to on-call theories. In *Vasquez v. Leprino Foods Company,* the plaintiffs alleged Leprino's employment manual at the Lemoore West facility required "responsiveness to superiors' requests and instructions," stressed "over communication," required the class members to meet production quotas and avoid production delays, and issued radios to some, but not all, of the class members.  *Vasquez*, No. 117CV00796AWIBAM, 2020 WL 1527922, at *15–16 (E.D. Cal. Mar. 31, 2020).  Similarly, in *Perez v. Leprino Foods Company*, the Court certified an on-call theory at the Lemoore East facility where Leprino instructed the employees to always follow supervisor directions, assigned some, but not all employees radios, and disciplined employees for production incidents that occurred while the employees were on break.  *Perez v. Leprino Foods Co.*, No. 117CV00686AWIBAM, 2021 WL 53068, at *11 (E.D. Cal. Jan. 6, 2021).  Likewise, the Court should grant class certification as to Plaintiff Bates's claims at Leprino's Tracy facility because they concern the exact same types of policies and practices of the exact same employer.

## THE FACTS

### A.     Background on the Tracy facility and the putative class members.

"Leprino strives to be the world's largest manufacturer of mozzarella cheese."  Dkt. 32-2, Ex. K, McDaniel Depo. at 62:10–18.  As part of its operations, Leprino operates a facility out of Tracy, California, which "mainly produces quality locked cheese and lactose."  *Id*. at 62:19–63:17.  This facility operates 24 hours a day, 7 days a week, and runs "anywhere from 300,000 to 600,000 pounds [of product] a day."  *Id*. at 64:25–65:21; *see also* Dkt. 32-2, Ex. L, Melo Depo. at 51:2–4.  To facilitate its operations, Leprino employs over 300 employees at this facility.  *See* https://leprinofoods.com/locations/tracy-ca/.

These employees work on one single production line that goes through each department.  Dkt. 32-2, Ex. K, McDaniel Depo. at 127:19–128:6.  "There's typically three shifts" for these employees and a "normal shift is eight hours."  *Id*. at 223:4–224:17.  All of the hourly production employees are also subject to a collective bargaining agreement ("CBA").  *Id*. at 188:20–24, 192:10–24; Dkt. 32-2, Exs. C and D.  As discussed below, the wage-and-hour policies in that CBA applied to each and every class member. Dkt. 32-2, Ex. K, McDaniel Depo. at 199:1–14.

/ / / /

/ / / /

2

**B.** **Leprino requires its hourly employees to come in early and unfairly rounds this time against them to the nearest 15 minute increment.**

Every class member is required to comply with the same time clock and time punch procedure as outlined in Section 3.3 of the Leprino Handbook.  Dkt. 32-2, Ex. L, Melo Depo. at 195:25–197:5; *see also* Exs. E, F, G, H. [Leprino's Handbooks During the Class Period].   This procedure results in both significant work performed off-the-clock and late meal breaks.

      **1.**    **Leprino requires employees to clock-in no more than seven minutes before the start of their shifts and disciplines them for being one-minute late.**

On the first day of orientation, all hourly employees are presented with a PowerPoint presentation, enrolled in the biometric timekeeping system, and trained on the process of clocking in and out. Specifically, they are shown the following slide that is substantively identical to Leprino's timekeeping policy for the entire class:



Dkt. 32-2, Ex. A.[1]   The class members uniformly understand this is Leprino's policy and confirm they

---

[1]   Leprino marked this entire document confidential.  As such, it is attached to Plaintiff's Request to Seal pursuant to Local Rule 141.

clock-in seven minutes early as a matter of course.[2]

Making this issue even worse, employees are forbidden from clocking-in just a single minute after their scheduled start time:

> Q:    According to Leprino's timekeeping policies, if an employee punches in one minute after their start time, they are considered late, correct?
>
> A:    Yes.

Dkt. 32-2, Ex. L, Melo Depo. at 213:14–214:4.  Every employee is also required to participate in the pre-shift meetings.  Dkt. 32-2, Ex. K, McDaniel Depo. at 129:12–130:12.  These meetings take place right at the start of the scheduled shifts,[3] so the class members know that if they're just one-minute late, they'll miss the pre-shift meeting and be considered tardy.[4]  As Mr. Rosales put it, for a shift that starts at 3

---

[2]    Dkt. 32–2, Ex. O, Anaya Depo. at 94:6–9 (confirming he clocks in seven minutes before his 7:00 a.m. shift); Ex. R, DeWalt Depo. at 49:21–50:4; 210:22–211:1; 211:14–212:1 (describing window of seven minutes to clock in); Ex. S, Chhann Depo. at 181:11–25; Ex. P, Guaydacan Depo. at 103:19–21 (punching in at 10:53 for 11:00 pm shift); Ex. T, Gutierrez Depo. at 123:23–124:1, 129:23–130:6 (trained to punch in seven minutes early), 131:1–5; Ex. V, Hurst Depo. at 109:20–110:7 (not paid for clocking in seven minutes before shift, even though he was performing work); Ex. X, Renteria Depo. at 214:5–13 (clocks in seven minutes before the shift); Ex. Q, Rosales Depo. at 38:22–39:17 (told to punch in seven minutes early before sign in time in orientation); Ex. M, Smith Depo. at 106:3–8 (clocking in at 5:23 am for shift starting at 5:30 am); Ex. U, Travers Depo. at 110:25–111:2 (could not clock in more than seven minutes before scheduled shift because "that's the rule."), 120:15–121:5, 103:5–21 (same); Ex. W, Yates Depo. at 73:11–74:11 (instructed by Leprino to clock in seven minutes prior to his shift), 110:18–22; see also Dkt. 32–3, Bates Decl. at ¶¶ 10–11; Dkt. 32–4, Baeza Decl. at ¶ 9, Rodriguez Decl. at ¶ 9, Walter Decl. at ¶¶ 7, 11, Bates Decl. at ¶ 11, Malic Decl. at ¶ 4, Austin Decl. at ¶ 9, Lewis–Brown Decl. at ¶ 7, Quarles Decl. at ¶ 4.

[3]    Dkt. 32–2, Ex. O, Anaya Depo. at 96:18–24 (confirming that his pre–shift meeting started at 7 a.m.); Ex. S, Chhann Depo. at 122:6–12; Ex. R, DeWalt Depo. at 190:13–191:8 (describing employees who complained about not having enough time to arrive at pre–shift meetings, which began when the shift started at 1:30 pm); Ex. M, Smith Depo. at 111:18–112:4 (supervisors made it very clear that "[i]f you are not at this meeting at your start time, you are late"); Ex. Y, Withers Depo. at 82:17–24 (supervisor confirming the first 30 minutes of the shift are scheduled for a preshift meeting); see also Dkt. 32–4, Malic Decl. at ¶12 (pre–shift meetings usually start in the beginning of scheduled shift), Austin Decl. at ¶12 (same).

[4]    Dkt. 32–2, Ex. AA, Alvarez Depo. at 125:21–126:4; Ex. O, Anaya Depo. at 96:18–24; Ex. R, DeWalt Depo. at 190:13–191:8, 176:24–177:7 (threatened for late punch when he was waiting in line to punch in); Ex. S, Chhann Depo. at 163:23–164:9 (supervisors or foremen told employees who were late to the pre–shift meeting to stand by and have a conversation after the pre–shift meeting); Ex. T, Gutierrez Depo. at 130:10–15, 144:18–145:5; Ex. V, Hurst Depo. at 108:2–16 (he would be late if he clocked in one minute after his scheduled start time), 172:16–24 (same); Ex. Q, Rosales Depo. at 39:3–17 ("So they gave you seven minutes to punch in so you won't be late.  But if you punch in at 3:01 you are late and they will point you for it."); Ex. Z, Sun Depo. at 125:12–21 (cheese manager confirming an employee is considered late if he or she clocks in one minute after their scheduled start time); Ex. M, Smith Depo. at 111:18–112:4, 112:13–113:2 (half a point for being tardy); Ex. U, Travers Depo. at 105:19–106:5, 108:5–109:2 (clocking in a minute late results in a half a point of discipline because Leprino cares about that minute); Ex. Y, Withers Depo. at 67:17–19 (confirming that a worker is considered late if he or she clocks in even one minute past their scheduled start time); Ex. W, Yates Depo. at

4

o'clock, "…if you punch in at 3:01 you are late and they will point you for it."  Dkt. 32-2, Ex. Q, Rosales Depo. at p. 39:10-17.

As such, this uniform policy and training instructs the hourly employees about two essential components of clocking-in at the Tracy facility: (1) Leprino *requires* them to come in up to seven minutes before the start of the shift, and (2) if they're a single minute late, Leprino will discipline them. Unfortunately, Leprino does not provide its hourly employees the same seven-minute window for clocking in after their shift is supposed to start.  In other words, if an employee clocks-in seven minutes early one day and seven minutes late the next, Leprino does not average this time out to zero.  Rather, because the class members have to get there early, this excess time *only* counts against them and Leprino receives the full benefit.

Conversely, the next page of the Power Point states employees ███████████ ████████████████████████████████████████████████████████████████ ████████████████████  Dkt. 32-2, Ex. A at LFC000495 (emphasis, underline, and capitalization in original).  Leprino's Rule 30(b)(6) witness confirmed the employees are not permitted to clock in more than seven minutes before the start of their scheduled shift, nor are they allowed to clock-out any more than seven minutes "after their stop time."  Dkt. 32-2, Ex. K, McDaniel Depo. at 181:13–183:12.  *See* Dkt. 32-2, Ex. AC, LFC000007 (time-clock cameras showed Plaintiff passing the time clock at five minutes after his shift).  If they try to clock-out any sooner, "[i]t generates unauthorized overtime," which is grounds for discipline.  *Id*. at 182:24–183:12.  She also confirmed the written policy makes no distinction as to whether this overtime was preapproved or not.  *Id*. at 183:12–184:20.  In fact, she admitted the only reason Leprino does not allow class members to clock-in any sooner is because "it causes unapproved overtime."  *Id*.  Leprino's other Rule 30(b)(6) witness also confirmed "repeated early punches will result in disciplinary action," just like the policy says.  Dkt. 32-2, Ex. L, Melo Depo. at 213:18–214:4.

/ / / /

/ / / /

/ / / /

157:22–159:6 (instructed that a worker would be considered late if he or she clocked in one minute after the start of scheduled shift); *see also* Dkt. 32–3, Bates Decl. at ¶¶ 4–5; Dkt. 32–4, Rodriguez Decl. at ¶ 9, Quarles Decl. at ¶¶ 4, 10.

5

**2.      Even though Leprino records employees' actual punch times, Leprino's payroll system ignores the actual punch times and artificially rounds the clock-in and clock-out times to the nearest 15 minute increment.**

Leprino records "the exact hour and minute of the punch" for every single employee.  Dkt. 32-2, Ex. L, Melo Depo. at 197:6–16, 204:10–24, 230:24–231:17 (confirming Leprino keeps the actual punch data).  Despite tracking this information, this is not how the class members are paid.

> Q:     However, for pay purposes, the punch time is rounded to the nearest quarter hour, correct?
>
> A:     Yes.
>
> Q:     And has this been the policy, the written policy, at Leprino Tracy facility for all the hourly production employees during the class period?
>
> A:     Yes.

*Id.* at 197:9–11; *see also id.* at 207:9–18.  Leprino then confirmed the example provided in the employee handbook is accurate, i.e., that "any time they punch in between 11:53 a.m. and 12:00 p.m. will be rounded to 12:00 p.m." for purposes of payroll.  *Id.* at 212:12–25.

**3.      Leprino's time and payroll data show that Leprino's rounding and attendance policies systematically underpay its employees in nearly every single pay period.**

Plaintiff analyzed Leprino's sample of time and payroll records, consisting of 16,943 shifts across 94 putative class members (out of a purported total of 412 putative class members) between December 1, 2016 and February 8, 2021.  Dkt. 32-6, Kriegler Decl. at ¶ 13, fn. 7.  In performing the analysis, Plaintiff computed the total number of weighted hours (accounting for overtime rates) of (1) unrounded time punches and (2) rounded time punches.  Analysis of rounded time and original time punches confirmed that in about 95.8% (2,000 out of 2087) of employee pay periods, Leprino's rounding policy resulted in a loss of wages for its employees.  *Id.* at ¶ 31.  Moreover, 98.9% of employees were underpaid.  *Ibid*.  With overtime and doubletime taken into account, Plaintiff found Leprino's rounding and attendance policies resulted in 2,089.58 hours of unpaid wages just for the small sample Leprino provided.  *Id.* at ¶ 30.  In other words, Leprino's time and payroll data showed that Leprino's timekeeping policies, taken together with its attendance policy, result in systematic deprivation of wages in almost every single pay period.

PLAINTIFF CHARLES BATES'S MOTION FOR CLASS CERTIFICATION

**C.** <u>**The seven-minute window is still not enough time to complete Leprino's other pre-shift requirements.**</u>

Leprino requires its employees to complete several tasks prior to the start of their shifts.  Even though the class members routinely clock-in seven minutes before the start of their shifts, employees have to start working even before they clock in.  For instance, every employee at the Tracy facility is required to follow the Good Manufacturing Practices ("GMPs").  Dkt. 32-2, Ex. K, McDaniel Depo. at 129:12–23, Dkt. 32-2, Ex. B.  These GMPs included "PPE [personal protective equipment] that you have to wear" and "washing your hands."  Dkt. 32-2, Ex. K, McDaniel Depo. at 79:20–80:2, 246:13–248:21.  As discussed below, employees complete these requirements well before their scheduled shift.  This is because the duties must be completed before entering the production floor.  In fact, these tasks are so time intensive the hourly employees arrive *well in advance* of their shifts—usually about twenty to thirty minutes before their start times.[5]

**1.** **All employees must put on Leprino-mandated uniforms and protective equipment prior to the start of their shifts.**

Every single employee has to wear Personal Protective Equipment when on the production floor.  Dkt. 32-2, Ex. K, McDaniel Depo. at 34:23–36:4.  These items "include the boots, the Leprino-issued uniform, safety glasses, Chums, hair net, bump cap, [and] earplugs."  *Id.* at 115:21–116:6, 204:2–205:4.  It also includes mandatory gloves.  *Id.* at 249:23–250:3.

The uniforms are located in a "clean locker" that the employees have to walk to before changing out of their personal clothes.[6]  It takes up to four minutes after entering the building to walk down the

---

[5]   Dkt. 32–2, Ex. O, Anaya Depo. at 94:12–25 (30 minutes); Ex. R, DeWalt Depo. at 165:9–13 (30 minutes early); Ex. S, Chhann Depo. at 137:7–21 (arriving to work at least 30 minutes early before shift); Ex. P, Guaydacan Depo. at 102:6–8 (arriving at parking lot at 10:40 pm for 11:00 pm shift); Ex. V, Hurst Depo. at 107:1–25 (going in and getting dressed twenty minutes before shift to be on time); Ex. M, Smith Depo. at 207:25–208:18 (30 minutes); Ex. Q, Rosales Depo. at 137:6–11 (arriving at 2:30, 2:31, 2:32 pm for a 3:00 pm shift); *see also* Dkt. 32–3, Bates Decl. at ¶ 6 (about 25 minutes); Dkt. 32–4, Austin Decl. at ¶ 7 (30 minutes), Baeza Decl. at ¶ 7 (20 minutes), Lewis–Brown Decl. at ¶ 6 (30 minutes), Malic Decl. at ¶ 4 (30 minutes), Quarles Decl. at ¶ 6 (25 minutes), Rodriguez Decl. at ¶ 4 (40 minutes due to multiple checkpoints), Vang Decl. at ¶ 5, Walter Decl. at ¶ 9 (arrive 1 hour before).

[6]   Dkt. 32–2, Ex. O, Anaya Depo. at 86:5–10; Ex. S, Chhann Depo. at 135:6–12 (obtaining clean uniform from designated locker); Ex. R, DeWalt Depo. at 170:1–8; Ex. P, Guaydacan Depo. at 103:22–104:14; Gutierrez Depo at 170:19–171:7; Ex. V, Hurst Depo. at 110:13–19 (gets uniform from clean locker); Ex. U, Travers Depo. at 114:11–21 (answering that going to the clean locker is the first stop in the dressout process); *see also* Dkt. 32–

7

---

hallway to the clean locker room, enter their locker combination, and retrieve the clean uniform.[7]  From there, the employees walk from the clean locker to their personal changing lockers where they input their personal locker combinations, take off their street clothes, and put on the Leprino pants, shirt, bump cap, and boots.  This process takes up to an additional fifteen minutes to complete.[8]

      **2.**      **Leprino also requires the class members to wash their hands and sanitize before the start of their shift and the pre-shift meeting.**

According to the GMPs, employees are also required to wash their hands and sanitize thoroughly *before* work and every single time they are absent from their workstation.  Dkt. 32-2, Ex. B; *id.* Ex. K, McDaniel Depo. at 79:20–80:2, 246:13–248:21.  This includes when they enter the facility, after they use the restroom, and when they enter the redline room.  *Id.* at 101:8–102:13.  Leprino places signs throughout the facility reminding the class members when and where they must wash their hands, then trains them on when and where to do so.  *Id.* at 103:5–104:14.  Specifically, employees have to wash their hands for no less than 20 seconds, then sanitize them.  *Id.*

This procedure takes place in an area that Leprino has designated as the "redline room."  *Id.*  In the redline room, Leprino requires its employees "to thoroughly wash and sanitize their hands to remove any allergen containing food residue from their hands when coming back from the floor from breaks or lunches" or anytime they enter the production facility.  *Id.* at 249:5–22.  Leprino also requires them to scrub their boots, put on a hair net, and put in earplugs while in that room.  *Id.* at 172:2–173:16.

---

3, Bates Decl. at ¶ 8; Dkt. 32–4, Baeza Decl. at ¶ 10, Lewis–Brown Decl. at ¶ 8, Malic Decl. at ¶ 7, Quarles Decl. at ¶ 8, Rodriguez Decl. at ¶ 7, Walter Decl. at ¶ 10.

[7]    Dkt. 32–2, Ex. O, Anaya Depo. at 86:5–10, 90:22–91:17, 93:1–25 (about three minutes); Ex. S, Chhann Depo. at 150:19–151:6 (describing a fifteen minute process that included entering the facility and changing for work); Ex. R, DeWalt Depo. at 171:18–172:7, 175:2–12; Ex. V, Hurst Depo. at 111:20–113:22 (a minute and a half to walk from entrance to clean lockers, one minute to grab clean uniform, another minute to walk to the changing room); *see also* Dkt. 32–3, Bates Decl. at ¶ 8; Dkt. 32–4, Baeza Decl. at ¶ 10, Quarles Decl. at ¶ 8 (3 minutes), Rodriguez Decl. at ¶ 7 (4 minutes).

[8]    Dkt. 32–2, Ex. O, Anaya Depo. at 90:22–91:17, 93:1–25 (at least seven minutes); Ex. R, DeWalt Depo. at 171:18–172:7, 175:2–12 (at least five minutes); Ex. S, Chhann Depo. at 150:19–151:6 (describing a fifteen minute process that included entering the facility and changing for work); Ex. V, Hurst Depo. at 112:13–24 (confirming that it takes five to six minutes to change into his uniform clothes); Ex. M, Smith Depo. at 83:24–84:10, 85:8–10 (ten to fifteen minutes); Ex. U, Travers Depo. at 114:11–116:10 (two to three minutes to walk to personal locker, one minute to grab uniform, five to seven minutes to take off street clothes and put on his uniform, three minutes to change shoes and walk from changing locker to the clock–in machine); Ex. Q, Rosales Depo. at 135:23–136:17; *see also* Dkt. 32–3, Bates Decl. at ¶ 8; Dkt. 32–4, Baeza Decl. at ¶ 10, Malic Decl. at ¶ 8 (around 10 to 15 minutes), Quarles Decl. at ¶ 9; Rodriguez Decl. at ¶ 7.

8

Employees in the processing department have to go through this procedure twice—i.e., wash their hands, sanitize, and scrub their boots, and again.  *Id.* at 174:10–25.

The employees confirm this sanitization process takes approximately five minutes.[9]  In addition to being in uniform, this sanitization process *also* must take place before the pre-shift meeting or the employees' official start times, so they try to complete this process within the seven-minute window before their pre-shift meetings.  *Id.*

The collective bargaining agreements during the class period also reflect the fact that Leprino was well aware that the pre-shift duties would take at least fourteen minutes to complete.  Tellingly, the agreements incorporate language that explicitly refers to time spent on duties that employees must complete before doing work.  For instance, Leprino's time clock policy states four minutes are necessary during meal periods to compensate "for potential issues related to travel, redline room, washing, cleaning and lines at the time clock."  Dkt. 32-2, Ex. C at LFC000166, Ex. D at LFC000235.  These duties, related to travel and sanitation, are the same duties that have to be completed by Leprino's employees prior to the start of their shifts as well.  See *supra*, fn. 9.  Additionally, Leprino also acknowledged that ten minutes are needed, at a minimum, for donning and doffing uniforms.   According to the collective bargaining agreements, Leprino also acknowledged that rest periods were increased by five minutes each (10 minutes total for an eight-hour shift) to "compensate for time spent donning and doffing."  Ex. C at LFC000164, Ex. D at LFC000233.  Even though Leprino knew that these duties, combined together, take at least 14 minutes, Leprino's timekeeping policy takes this time away from class members through rounding the 14 minutes (seven miniutes before and seven minutes after the shift) against the class.

### 3. These pre-shift requirements result in a line of employees trying to clock-in, seven minutes before the start of the employees' shifts.

There is not enough time for Leprino's employees to complete the lengthy uniform process, wash

---

9   Dkt. 32–2, Ex. N, Allan Depo. at 29:25–30:13 (describing sanitization process); Ex. O, Anaya Depo. at 101:25–102:3 (about three minutes); Ex. S, Chhann Depo. at 52:15–54:20 (describing sanitation process as being about five minutes); Ex. R, DeWalt Depo. at 185:9–186:10 (at least two minutes spent on washing hands because of company concerns with bacteria), 107:19–108:12, 109:10–16 (five minutes extra to go through sanitation stations); Ex. T, Gutierrez Depo. at 175:15–176:17; Ex. Q, Rosales Depo. at 87:23–88:8 (two and a half minutes to three minutes); Ex. M, Smith Depo. at 90:3–13; *see also* Dkt. 32–3, Bates Decl. at ¶ 12; Dkt. 32–4, Austin Decl. at ¶ 11, Baeza Decl. at ¶ 11, Lewis–Brown Decl. at ¶ 10, Malic Decl. at ¶ 10, Quarles Decl. at ¶ 11, Rodriguez Decl. at ¶ 10, Vang Decl. at ¶ 8, Walter Decl. at ¶ 12.

---

their hands, and complete the sanitization process within seven minutes.  In addition, Leprino only has two time clocks at the front entrance.  Dkt. 32-2, Ex. K, McDaniel Depo. at 165:1–167:7.  There are no additional time clocks in the singular breakroom, the production floor, or the locker rooms, so the class members have to walk to and from the front entrance time clocks in order to punch in or out.  *Id.*; *see also id.* at 178:10–179:20.

As a result, the class members put on their uniforms *before* clocking-in and then have to wait in line because everyone is trying to clock-in at the same time.[10]  Leprino's Rule 30(b)(6) witness confirmed she sees a line forming for this exact reason:

> Q:    To use the time clock, have you ever seen there being a line formed?  People to use the time clock.
>
> A:    Yes.
>
> Q:    And when have you seen a line formed for using the time clock?
>
> A:    When people are trying to wait for the seven minutes before the end of their shift.
>
> Q:    What is the seven minutes before the end of the shift?
>
> A:    So they can't clock in—they can't clock in prior to seven minutes, and they can't clock out seven minutes after.  So sometimes you'll see a line because they don't want to wait for that—they want to stay within that seven-minute timeframe.

Dkt. 32-2, Ex. K, McDaniel Depo. at 181:13–182:8.

**D.    Leprino's facially invalid rounding policy causes late lunch breaks because it ignores the first seven minutes before the start of the scheduled shifts.**

Despite tracking the class members' exact punch times, Leprino ignores this data for purposes of calculating late breaks.  In other words, instead of using the class members' actual punch times, it rounds the time to the nearest 15 minute increment and doesn't pay employees if they've been working on-the-

---

[10]    Dkt. 32–2, Ex. O, Anaya Depo. at 111:19–112:2; Ex. S, Chhann Depo. at 37:17–23 (receiving verbal warning from supervisor about not changing before clocking in for work); Ex. V, Hurst Depo. at 113:24–114:4 (line of two to four people using the clock–in machine); Ex. Q, Rosales Depo. at 135:23–136:17; Ex. M, Smith Depo. at 209:6–16; Ex. U, Travers Depo. at 109:17–19 (seen employees fully dressed before clocking in), 136:5–25; Ex. W, Yates Depo. at 111:11–20 (confirming it takes 5 minutes to walk from changing locker to maintenance department); *see also* Dkt. 32–3, Bates Decl. at ¶ 10; Dkt 32–4, Baeza Decl. at ¶ 9, Malic Decl. at ¶¶ 8, 9, Quarles Decl. at ¶ 10.

clock for over five hours.  Indeed, California law requires breaks be taken "no later than **end** of the employee's **fifth** hour of work." *See Brinker, supra,* at 1041 (emphasis added).  The "end of the employee's fifth hour of work" is 4 hours, 59 minutes, and 59 seconds so anything later is automatically late.

Leprino's person most knowledgeable confirmed that Leprino did not account for its rounding policy when determining the timing of meal breaks.  For example, Ms. Melo was cross-examined about an employee who punched in at 5:24 a.m. and punched out for a meal break at 10:25 a.m.  Dkt. 32-2, Ex. L, Melo Depo. at 220:3–222:15.  Leprino admitted that the employee "was on the clock for five hours and one minute." *Ibid*.  However, Leprino "rounded his time to five hours." *Ibid.*; *see also id.* at 227:1–20, 232:14–233:23 (confirming the employee's time was rounded and he was only paid for five hours).  Despite this being a late break (taken after the end of the fifth hour), Leprino confirmed it did not pay the employee a meal premium for this late break. *Id*. at 244:2–247:13.

Leprino then confirmed its uniform policy is not to calculate the timeliness of breaks by punch time or time working on-the-clock.  Rather "[i]t would depend on their *scheduled time* that they worked as well." Dkt. 32-2, Ex. L, Melo Depo. at 245:4–13.  In other words, Leprino ignores the actual time spent on the clock when calculating late breaks, giving itself several minutes of leeway to provide late breaks.  Unfortunately, no one at Leprino reviews the time records to determine whether meal breaks are late, short, or missed, based upon this rounding policy. *Id*. at 277:2–22.  Accordingly, the class members confirm their meal breaks are not timely.[11]

**E.**   **Leprino requires its employees to remain "on-call" during meal and rest periods.**

Leprino requires its employees to remain "on-call" during their meal and rest breaks to watch the production line and to respond to communications from supervisory personnel at all times.

/ / / /

/ / / /

---

[11]   Dkt. 32–2, Ex. R, DeWalt Depo. at 87:8–24 (describing supervisors clocking him out for meal periods to record break by the fifth hour); Ex. P, Guaydacan Depo. at 82:1–20 (describing punch out at the 5th hour of work); Ex. L, Melo Depo. at 245:4–13 (stating that the lunch break would depend on the scheduled time that employees worked); Ex. W, Yates Depo. at 157:22–158:20 (told by Leprino that seven minutes before shift are rounded up and seven minutes after shift are rounded down); *see also* Dkt. 32–4, Baeza Decl. at ¶ 6 (often did not get a break before the fifth hour of work); Walter Decl. at ¶ 4 (stay working on machines through break).

1

2

### 1.  Leprino requires its employees to watch the production line, even during meal and rest breaks.

As a core value, Leprino emphasizes quality at the Tracy facility.  Dkt. 32-2, Ex. L, Melo Depo. at 51:13–15.  The quality of the cheese is every single hourly employee's responsibility.  Dkt. 32-2, Ex. K, McDaniel Depo. at 72:7–18 (Leprino's Rule 30(b)(6) witness confirming "every employee is responsible to make sure we've produced a quality product").  Specifically, these employees are required to continuously look for the color and cut of the cheese.  *Id*. at 71:6–18.  They also have to continually check their machines to detect unwanted metal.  *Id*. at 87:24–88:13.  This responsibility does not stop.  As Leprino's Rule 30(b)(6) witness testified, "[a]ll employees have to be watching the product **as it's running**, so they're looking for any quality concerns."  *Id*. at 73:9–25.  To facilitate this emphasis on quality, "[a]ll employees are trained and given the topics, or given the resources needed to make sure that they can inspect products for all quality concerns."  *Id*. at 74:1–24.  In turn, inspecting and figuring out what solution there may be for any of the quality control problems with a product is a job duty and responsibility of all class members at the Tracy facility.  *Id*. at 75:7–13.  Moreover, as the employment manual confirms, employees are required to adopt a proactive mindset as just one employee's lack of effort can create poor customer service.  Dkt. 32-2, Ex. F at LFC000807.

As part of this emphasis on quality, Leprino provides a standardized quality training that lasts approximately four hours for every hourly employee.  Dkt. 32-2, Ex. K, McDaniel Depo. at 76:9–77:14.  During this meeting, "[w]e teach about allergen control, we teach about proper handwashing on the floor, gloves, proper tools that are utilized on the floor, color coding" and more.  *Id*. at 99:3–10.

Due to the time-sensitive nature of making cheese, the production line at which these hourly employees work does not stop unless there is an emergency.  *Id*. at 65:22–66:23.  If cheese builds up on the line and falls on the floor, Leprino loses money.  *Id*. at 240:2–241:6.  As Leprino's Rule 30(b)(6) witness confirmed, the hourly employees can be written up if cheese falls on the floor.  *Id.*  Leprino also has a procedure called "binning" or "bulking off" where the class members remove excess cheese from the line "so that the cheese doesn't fall on the floor."  *Id*. at 241:1–6.  To prevent this and to ensure a continuous flow of operations, Leprino requires the class members to attend to their duties and the line at

12

all times, even during meal and rest periods.[12]   Adriano Sun, Leprino's Cheese Manager, explained that during bin-offs, "[e]veryone that could help will be helping," and that the binning off process is meant to minimize the amount of monetary loss to the company.  *See* Dkt. 32-2, Sun Depo. at 120:7-121:4.

### 2.   Leprino requires employees to respond to their supervisors at all times.

Similarly, the class members have to be ready and willing to respond to supervisors at all times, even during meal and rest breaks.[13]   Leprino's Rule 30(b)(6) witness also confirmed "the supervisors are

---

[12]   Dkt. 32–2, Ex. O, Anaya Depo. at 59:18–60:23; 65:1–66:5 (having to keep an eye on equipment during breaks); 67:8–68:18, 69:7–18; *see also id.* at 149:10–150:25 (recalling two specific instances of being called back to work and having to clock back in towards the end of his break); Ex. R, DeWalt Depo. at 204:4–205:7; 205:8–21 (describing nature of interruptions); Ex. S, Chhann Depo. at 96:6–25 (hearing over the radio to go "help put cheese in a box in a box because the line is down"); Ex. P, Guaydacan Depo. at 71:5–14 (supervisor told him "I need this product so we can start up cheese. And I need it now," after knowing that he was on break); Gutierrez Depo at 97:20–98:21 (describing situations requiring "all hands on deck"); Ex. V, Hurst Depo. at 128:7–12 (malfunctions or binning off are emergencies), 145:7–146:12 (knowingly called maintenance employees off breaks during catastrophic events); Ex. Q, Rosales Depo. at 182:21–183:17; Ex. M, Smith Depo. at 153:23–154:23 (employees understood they could interrupt each other with questions about the equipment); Ex. U, Travers Depo. at 62:25–63:22, 63:2–64:1 ("cheese doesn't stop coming … starts piling up like a nightmare"), 64:14–25 (employees knew that cheese could start falling on the floor at any time and belts could stop), 86:21–87:18 (foremen have to respond to radio calls in case of emergencies such as "a tsunami of cheese hitting the floor" when machines stop); Ex. Q, Rosales Depo. at 67:2–68:12 (stopping everything and helping when production stops but cheese is still falling over), 117:5–14 (responsible for switching ingredient while on break); Ex. Y, Withers Depo. at 34:22–35:12 (confirming that he called employees from their lunches to assist whenever the plant would go down to fix problems and resume production); Ex. W, Yates Depo. at. 159:23–160:1 (recalls missing his meal periods when "emergency breakdowns" occurred), 160:7–161–3 (supervisors asking workers to miss mealbreaks to fix emergency breakdowns); *see also* Dkt. 32–3, Bates Decl. at ¶ 19 ("I had to be on the lookout and be responsive to bulk–off incidents…" and when cheese was stuck on the conveyor belt); Dkt. 32–4, Baeza Decl. at ¶¶ 4–6 (breaks cut short by supervisors or foremen), Malic Decl. at ¶ 13, Quarles Decl. at ¶ 13.

[13]   Dkt. 32–2, Ex. N, Allan Depo. at 68:11–69:11 (supervisor interrupting lunch multiple times); Ex. O, Anaya Depo. at 69:7–18; *see also id.* at 149:10–150:25 (recalling two specific instances of being called back to work and having to clock back in towards the end of his break); Ex. S, Chhann Depo. at 72:18–25, 74:3–25, 88:16–92:23, 108:4–111:3 (confirming his supervisor said "I just want you to stay nearby because a lot of things can happen so I need you to quickly respond and come back just in case anything happens down the line"); Ex. R, DeWalt Depo. at 41:25–42:8 (describing people called off breaks via radio); 204:4–205:7; Ex. T, Gutierrez Depo. at 97:20–98:21 (responding to binning off and production stopping); 195:7–196:1 (responding to radios); Ex. V, Hurst Depo. at 87:16–22 (supervisors contacted mechanics for assistance at any time), 92:4–8 (supervisors called him around two to three times per night via radio); 146:13–147:6 (he called employees on their break to answer work–related questions), 149:17–21, 150:8–151:9, 154:18–155:16; Ex. Q, Rosales Depo. at 125:21–126:3; Ex. Z, Sun Depo. at 130:23–131:5 (he called foremen on their radio while they were on a meal break), 132:20–133:4 (stating that he would call foremen during their break if he had a question or needed help); Ex. M, Smith Depo. at 94:1–21, 97:25–98:18 (supervisors telling employees to clock out but take the lunch later), 188:18–189:6; Ex. U, Travers Depo. at 85:11–87:15 (describing radios going off in breakroom); 89:5–90:9 (radios are always on and used during breaks); *see also* Dkt. 32–3, Bates Decl. at ¶ 19; Dkt. 32–4, Austin Decl. at ¶ 6, Baeza Decl. at ¶¶ 4–6 (breaks cut short by supervisors or foremen), Malic Decl. at ¶ 14 (interrupted by supervisors with work questions during break), Quarles Decl. at ¶ 13, Rodriguez Decl. at ¶ 11 (had to respond to texts), Vang Decl. at ¶ 10 (interrupted during breaks because of reasons such as short staffing), Walter Decl. at

---

the ones calling these people back" from their breaks.  Dkt. 32-2, Ex. L, Melo Depo. at 314:8–19.  Despite

recognizing this occurs, Leprino does nothing to discipline supervisors when they interrupt breaks.  *Id.*

**3.**     **Leprino issues radios to its employees and expects them to respond at all times.**

Leprino issues its hourly employees radios, including "floor people, maintenance employees,

warehouse employees" and "there are other radio locations throughout the facility that are not carried by

employees."  Dkt. 32-2, Ex. K, McDaniel Depo. at 225:3–226:4.  Leprino provides hourly employees with

radios but little training on how to use them.  *Id.* at 99:16–100:4, 226:12–227:10.  However, unlike the

Lemoore West facility, Leprino's Tracy plant does not have any signs or instructions instructing the

employees whether they should turn off their radios during breaks, nor does Leprino train them about

when to turn off their radios.  *Id.* at 229:4–16.  In fact, Leprino requires them to keep their radios on at all

times:

Q:     Leprino expects employees to have their radios on while they're working, right?

A:     We expect the employees to have their radios on while they're doing their
       production work, when they're on the floor doing their job.

*Id.* at 229:21–232:11.  In turn, the class members keep their radios on during breaks so they can be

reachable at all times.[14]

---

¶ 6 (interrupted by supervisor or manager with a question or being called back to work).

[14]   Dkt. 32–2, Ex. N, Allan Depo. at 87:16–88:3 (witnessing radios being answered in the break room "quite
often"); Ex. AA, Alvarez Depo. 163:18–165:6 (foremen and maintenance men wear radios and leave radios on in the
breakroom), 166:22–167:5 (five or six people with radios in the breakroom on average); Ex. O, Anaya Depo.
at 156:6–157:7 (describing radios used in breakroom); Ex. S, Chhann Depo. at 95:18–97:18, 96:6–25 (hearing
radios for help during break); Ex. R, DeWalt Depo. at 41:25–42:8 (describing people called off breaks via radio),
204:4–205:7; Ex. P, Guaydacan Depo. at 68:10–69:5 (supervisor required him to have his radio on at all times,
even during breaks), 92:12–93:2 (interrupted during lunch via the radio), 120:8–17 (confirming other employees
were called back to work during breaks over the radio), 121:18–24 (coworker had to continue removing pallets
with product, even though he was on a break), 127:10–128:9 (witnessed foreperson called from break on the
radio to finish changing a belt), 144:7–12 (supervisor expressly required to keep his radio on him at all times);
Ex. T, Gutierrez Depo. at 87:16–89:12, 92:20–93:3, 186:14–22 (employees used radios at any time during the
shift if they were on a machine that stopped working); Ex. V, Hurst Depo. at 81:1–12 (Leprino does not instruct
workers on when to turn their radios on or off), 145:7–146:12 (called a maintenance employee who was on break
via the radio), 149:17–21 (he had been called on the radio to come back from a break to do work), 151:18–152:8
(radio communication is the "lifeline" for Leprino to address unexpected problems in the production), 174:15–
175:8 (confirming that foremen from the other departments kept their radios on during their breaks); Ex. X,
Renteria Depo. at 225:5–22 (radio used to notify employees of binning or bulking off), 225:23–226:19 (radios
used to contact other departments for help); Ex. Z, Sun Depo. at 139:9–23 (personally saw workers in a
breakroom responding to radio calls); Ex. U, Travers Depo. at 89:5–90:9 (radios are kept on and used during
breaks), 143:7–21 (radios are annoying because "[y]ou're hearing the calls coming in from all over the plant");

14

Even if an employee does not have a radio on them, Leprino still expects the employees to be responsive.  That is, as Leprino's Rule 30(b)(6) witness testified, "[i]f an employee doesn't have a radio, the forepersons are on the floor, supervisors are on the floor.  There are also other locations that have stationary radios that an employee can walk to and call people."  *Id*. at 231:11–232:11.  Consistent with the employee's testimony, she also admitted she has heard radios go off while she was in the breakroom and employees responded.  *Id*. at 234:8–10.  Even if employees left the facility, they would still have to respond, because supervisors would call the personal cell phones of employees.

> Q:    Do you ever - - are there any other ways you can go and get an hourly maintenance employee besides the radio and physically going there to the breakroom?
>
> A:    That's our normal process.
>
> Q:    Have you ever done it any differently?
>
> A:    I have called the cell phone.
>
> Q:    Personal cell phones?
>
> A:    Yes.

Dkt. 32-2, Withers Depo. at 35:15-36:4 (calling personal cell phone of employees to come and assist during their breaks).

### 4.    Employees hear their names called on Leprino's public announcement, intercom, and radio systems during breaks.

Leprino also utilizes a public announcement system, or intercom, that can be heard throughout the entire production floor.  Dkt. 32-2, Ex. L, Melo Depo. at 168:5–10.  Several class members recall hearing the intercom and having to listen for their names while on breaks in case they were called back to the production line; Leprino's managers or supervisors also used the radio to notify employees of urgent or

---

Ex. Y, Withers Depo. at 13:25–14:2 (utility technicians carry a radio with them at all times), 27:13–16, 28:1–14 (supervisor confirmed employees have their radios on during their lunch break, and that he called employees on the radio while they were on meal or rest break); Ex. W, Yates Depo. at 176:6–13 (was expected to have a radio on him throughout the work day, including breaks), 178:23–179:1 (hearing other employees' radios going off while in the break room), 179:17–25 (stating there was no expectation to turn off his radio while in the breakroom), 180:1–22 (supervisor called his radio while on a break), 182:24–183:3 (seeing other workers respond to a radio while on break); *see also* Dkt. 32–3, Bates Decl. at ¶ 20 (supposed to answer radios on breaks); Dkt. 32–4, Malic Decl. at ¶ 15 (workers who carried radio were called back from breaks), Rodriguez Decl. at ¶ 12 (radios were used to call employees who were on breaks), Walter Decl. ¶ 5 (unacceptable to turn radio off as a foreman).

15

emergency situations occurring at the facility, such as during bulk-offs or bin-offs.[15] Dkt. 32-2, Ex. I. Because bulk-offs frequently occur at the plant, employees must be ready to assist, even during their breaks.[16]

>    **5.    Leprino incentivizes its supervisors and foremen to keep the machines running, even if it means that employees have to work through their breaks.**

Leprino provides a series of incentive bonuses to its employees based on criteria that includes goals and metrics based on cost and production.   For example, Leprino's Cheese Manager, Adriano Sun, explained that bonuses are based on production metrics, which are adversely affected by overtime and premium pay for meal and rest break violations.

> Q:    Because if you are over on overtime and penalty budget, that would place your labor hour budget to be overbudgeted, right?
>
> A:    So the entire labor budget will – gets affected, yes.
>
> Q:    And that in turn could affect the overall production metric at the plant, right?
>
> A:    Yes.
>
> Q:    … [a]s a cheese manager, do you receive bonuses?
>
> A:    Yes.
>
> Q:    What is your bonus based on?
>
> A:    Objectives.

---

[15]   Dkt. 32–2, Ex. N, Allan Depo. at 56:14–57:22; Ex. X, Renteria Depo. at 225:5–22 (radios used to notify employees of binning or bulking off), 225:23–226:19 (radios used to contact other departments for help); Ex. U, Travers Depo. at 142:14–143:3 (PA system was used before radios); *see also* Dkt. 32–4, Baeza Decl. at ¶ 4 (while in the breakroom, supervisor or foremen would announce over the loudspeaker or radio "that milk was overflowing and we needed to get back to the production floor immediately").

[16]   Dkt. 32-2, Ex. Z, Sun Depo. at 116:18–117:17 (binning off occurs when cheese supervisors are notified that quality of cheese is negatively impacted), 119:1–7 (personally binning off to prevent the cheese from falling on the floor) 108:13–21 (Leprino maintains reports pertaining to bin-off incidents), 109:14–110:11 (bin-off reports indicate the root cause, production dates, amount of binned off totes and pounds of cheese); Withers Depo. at 106:11–18 (cheese is bulked off into totes when the product code is incorrect or when there is a production or mechanical failure at the plant), 113:6–114:3, 113:16–114:3 (Leprino's production line automatically alerts employees about a bulk-off incident with a siren and a flashing light), 115:20–116:2 (bulk-offs could occur multiple times a day, once a day, or once a week), 113:6–15 (Leprino tells its employees that whenever they hear the siren or see the flashing lights, they are expected to help with the bulk-off), 116:6–22 (confirming that employees could have been called off from a break to assist with the bulk-off), 123:2–11, 124:3–17 (daily email is sent out summarizing frequency of bulk offs occurring and total totes bulked off day prior).

16

---

1    Q:    Is Production a part of it?

2    A:    Yes.

3    Q:    Production has always been part of the plant objective that is tied to your manager bonus,

4          correct?

5    A:    Yes.

6  Dkt. 32-2, Ex. Z, Sun Depo. at 83:13-84:25 (objections omitted).  And if departments are over budget in

7  terms of overtime and premium pay, Leprino's managers are expected to provide an explanation to their

8  supervisors and corporate management.

9    Q:    Earlier you mentioned that when you are over the budget in terms of overtime and

10         penalty pay, you have to speak to somebody about it, right?

11   A:    There is a need to explain why you haven't met budget.

12   Q:    Who do you explain it to?

13   A:    Plant manager, plant production manager, plant controller, corporate group.

14  Dkt. 32-2, Ex. Z, Sun Depo. at 91:3-13 (objections omitted).

15      Thus, Leprino encourages its departments to reduce costs, while increasing production efficiency,

16  such as increasing the pounds per labor hour.  For example, Leprino trains and encourages its managers

17  and supervisors to keep the machines running, reduce overtime, and reduce premium pay for missed

18  breaks.[17]  Leprino utilizes production metrics and sends monthly reports to its managers about overtime

19  and premiums pay, as well as reports of how long machines were operating.[18]  As a consequence of these

20

21      [17]   Dkt. 32–2, Ex. AA, Alvarez Depo. at 178:21–179:12 (incentive check is based on plant meeting

22  production goals); Ex. U, Travers Depo. at 166:2–19,  166:20–167:10, 168:18–169:4 (received incentive bonuses
    based on production goals on a monthly / quarterly basis since 2011); Ex. Z, Sun Depo. at 82:12–19 (managers

23  are expected to stay within budget, including the budget for overtime and penalties), 83:13–84:7 (if department is
    over budget, that negatively affects production metrics at the plant), 84:21–25 (bonuses are tied to production

24  metrics), 97:17–98:3 (managers train supervisors on approving penalty pay).

25      [18]   Dkt. 32–2, Ex. Z, Sun Depo. at 74:13–75:7 (Leprino measures pounds of product produced per labor hour
    to assess its plant's production efficiency), 74:13–23 (pounds per labor metric is total pounds of product divided

26  by the total hours spent in each department), 79:19–80:11 (stating that overtime and penalty pay are a part of the
    figure representing labor hour budget), 76:14–77:18, 78:20–79:1 (confirming that pound per labor indicator is

27  compared to a "budget pounds per labor hour", which is a figure provided by Leprino's accounting department),
    87:14–25 (employee salaries are part of plant costs, a key metric used at the plant), 90:1–17 (managers must

28  review monthly report showing percentage of overtime used), 95:17–96:6 (managers must review monthly report
    showing penalty pay), 100:2–24, 101:7–24, 103:1–13 (incentivized to keep labor costs, overtime and penalty pay
    as low as possible); Ex. Y, Withers Depo. at 90:17–91:13 (confirming that supervisors operate off of a budget of

17

metrics, employees are also pressured to work through their breaks, and to avoid triggering premium pay in Leprino's timekeeping system.[19]

**F.**   **Leprino confirms there is nothing about the nature of the work that prevents Leprino from scheduling more employees to prevent breaks.**

Leprino also utilized an on-duty meal period agreement at the Tracy facility, which required the class members to work a "straight 8" shift.  Dkt. 32-2, Ex. J.  However, Leprino itself confirmed there is nothing about the nature of the work that would have prevented it from being able to provide the class members with breaks.  Dkt. 32-2, Ex. K, McDaniel Depo. at 222:19–223:3.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 provides that " '[a] class action may be maintained if two conditions are met:  The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b).' "  *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) (alteration in original) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)).

Rule 23 is not "a mere pleading standard," so establishing its requirements sometimes requires evidence, which courts must subject to a " 'rigorous analysis.' "  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  While such rigor "may 'entail some overlap with the merits of the plaintiff's underlying claim,' " the likelihood of overlap is "no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—they are relevant to determining whether the

---

hours, taking into account the number of workers in a team and a set number of overtime to allocate among those workers).

[19]   Dkt. 32–2, Ex. AA, Alvarez Depo. at 192:10–193:1 ("I punched out for lunch prior — correctly on time, but I didn't take my actual lunch till after I was finished doing what I was doing …I punched out for lunch, and then I punched back in for lunch.  I worked through my lunch, because I had something going on that I was unable to leave.  I couldn't leave."); *see also* Dkt. 32–4, Austin Decl. at ¶ 6 (prioritizing production of cheese over breaks); Baez Decl. at ¶ 6 (supervisor would "tell us to clock out by the fifth hour, make note of the time, but go back to working without actually getting a break… then clock back in as if we took a break"); Lewis–Brown Decl. at ¶ 4 (supervisors "chew you out until you leave the break and go back to work" and did not get a full rest break to make up for it); Vang Decl. at ¶ 9 (supervisor instructed us to clock out on the time clock for a lunch as if we were taking a lunch when in reality we went back to work).

---

Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (quoting *Wal-Mart*, 131 S. Ct. at 2551)). This is because "[t]he certification question is 'essentially a procedural one,' " that examines "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." *Sav-on Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 326, 327 (2004) (quoting *Linder v. Thrifty Oil Co.*, 23 Cal. 4th 429, 439–40 (2000)).

Finally, courts "retain[ ] the flexibility to address problems with a certified class as they arise, including the ability to decertify." *United Steel Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010). Therefore, any " 'doubts regarding the propriety of class certification should be resolved in favor of certification.' " *Edwards v. First Am. Corp.*, 289 F.R.D. 296, 299–300 (C.D. Cal. 2012) (quoting *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007)).

## ARGUMENT

## I.   ALL FOUR RULE 23(A) PREREQUISITES ARE MET.

All of Rule 23(a)'s prerequisites are satisfied, and the proposed class meets the requirements of Rule 23(b)(3). The class should be certified.

### A.   The class is sufficiently numerous to make joinder impracticable.

Numerosity requires a class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). To satisfy this requirement, the plaintiff does not need to demonstrate the exact number of class members, nor is there a particular magic number that is required. *See In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005). Nevertheless, "a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *See* William Rubenstein et al., Newberg on Class Actions § 3:12 (5th ed. 2011). Here, the proposed class consists of at least 300 or more production workers, so numerosity is easily satisfied.

### B.   There are common questions that will drive the resolution of the litigation.

Commonality requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). " 'All questions of fact and law need not be common to satisfy [this requirement]. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.' " *Meyer v. Portfolio Recovery*

*Assocs.*, 707 F.3d 1036, 1041 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). Simply put, commonality "is more qualitative than quantitative." 1 Rubenstein et al., *supra*, § 3:20. "Even a single common question will do." *Wal-Mart*, 131 S. Ct. at 2556 (alterations and internal quotations marks omitted); *accord Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (" 'So long as there is "even a single common question," a would-be class can satisfy the commonality requirement of Rule 23(a)(2).' " (quoting *Wang*, 737 F.3d at 544)).

The common question must, however, "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. Put differently, commonality focuses on whether the answer to a common question will " 'drive the resolution of the litigation.' " *Id.* (emphasis omitted) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Therefore, "[t]hough common issues need not be 'dispositive of the litigation,' they must 'present a significant aspect of the case [that] can be resolved for all members of the class in a single adjudication' so as to justify 'handling the dispute on a representative rather than an individual basis.' " *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 537 (N.D. Cal. 2012) (second alteration in original) (quoting *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 29 (D.D.C. 2001) and *Hanlon*, 150 F.3d at 1022); *accord* Am. Law Inst., *Principles of Law of Aggregate Litigation* § 2.01 (2009) ("Common issues are those legal or factual issues that are the same in functional content . . . regardless of whether their disposition would resolve all contested issues in the litigation.").

"Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (citing *Parsons*, 754 F.3d at 676). Therefore, to determine whether commonality is satisfied, the Court should examine the elements of Plaintiff's claims and determine whether the common questions related to Plaintiff's theory of classwide recovery will "drive the resolution" of those claims. *See e.g., id.* at 1165–66 (comparing the common questions to the elements of an off-the-clock claim); *Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952, 958–63 (9th Cir. 2013) (comparing common questions to the elements of California's "nature of the work" exception).

////

### 1. Common questions will drive the resolution of Plaintiff's wage claims against Leprino for improper rounding.

An employer may utilize a rounding policy only if the policy is fair, neutral on its face, and used in a manner that will not result in failure to compensate the employees properly for all time they actually worked. *See See's Candy Shops, Inc. v. Superior Court* (2012) 210 Cal.App.4th 889, 907 (citations omitted). Furthermore, an employer may not refuse to pay an employee for time worked under a grace period policy if the employee is working or subject to the employer's control. *See id*. at 909. This is because it is well established that employers must compensate employees for all time worked. "[E]mployees [a]re subject to the control of their employers when they are prevented from using 'the time effectively for [their] own purposes.'" *Id.* at 910 (citing *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 582). *See Troester v. Starbucks Corp.* (2018) 5 Cal. 5th 829, 841–848 [rejecting argument that 4–10 minutes spent on pre-shift duties was not compensable because "what [the employer] calls "de minimis" is not de minimis at all to many ordinary people who work for hourly wages."].) Where an employer combines the rounding practices with other restrictions (e.g., threatened discipline for clocking in or clocking out late), the rounding policy is no longer neutral. *See Selk v. Pioneers Memorial Healthcare District* (S.D. Cal., Apr. 22, 2014) 2014 WL 12729167, at *4. In *Selk*, the court found that a rounding policy may no longer be neutral when the employer also "considers employees to be 'tardy' if 'they arrive at their work stations late,' " and "has policies that require employees to clock in and out 'no later than 7 minutes from the start/end of the shift.' *Id.* Likewise, in *Bebber v. Dignity Health*, the court determined the employer's "strict no overtime policy" where "overtime may only be worked with prior approval on an employee's supervisor," coupled with the requirement for "employees to start each work period on time" resulted in a rounding claim that was amenable to class treatment because such policies regarding rounding, tardiness, and overtime were "applicable to all class members." *Bebber v. Dignity Health*, 2021 WL 1187268, at *16, 18 (E.D. Cal., Mar. 30, 2021) .

Leprino's time punch policies, taken together with its rounding policies, result in a rigged system against its employees. Here, ample evidence supports the fact that Leprino requires employees to perform pre-shift work prior to, or immediately after clocking in. Numerous employees stated that as part of their duties before their shift starts, they have to pick up a clean uniform, change out of their clothes, put on

PPE, sanitize their hands, scrub their boots, and walk over to their pre-shift meeting areas.  See *supra*, fns. 6–10.  These employees were prevented from using the time before the start of the shift for their own purposes, but instead had to comply with Leprino's preshift requirements.  Leprino does not pay its employees for this time, because it pressures employees to perform this work off the clock.  And since employees cannot clock in for work even one minute late, time is nearly always rounded against employees; never for them, which constitutes a policy that, over a period of time, fails to compensate Leprino's employees for all the time they actually worked.  Not surprisingly, analysis of the Leprino's time records shows that Leprino's policies lead to a one-sided result against employees.  Consequently, Plaintiff analysis of Leprino's time records shows 2,089.58 in unpaid hours.

### 2. Common questions will drive the resolution of Plaintiff's timely meal break claims in light of *Donohue*.

California law "obligates employers to afford their nonexempt employees meal periods and rest periods during the workday." *Brinker*, 53 Cal. 4th at 1018 (citing Cal. Lab. Code §§ 226.7, 512).  An employer's responsibilities are the same for both types of breaks.  *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 265 (2016).  They "must 'relieve the employee of all duty and relinquish any employer control over the employee and how he or she spends the time.' " *Id.* (quoting *Brinker*, 53 Cal. 4th at 1038–39).

Importantly, California law also requires breaks be taken "no later than **end** of the employee's **fifth** hour of work." *Brinker*, 53 Cal. 4th at 1041. As the California Supreme Court recently reiterated, "[t]o avoid liability, an employer must provide its employees with full and timely meal periods whenever those meal periods are required." *Donohue v. AMN Servs., LLC* (2021) 11 Cal. 5th 58, 68.

To that end, "[t]he practice of rounding time punches for meal periods is inconsistent with the purpose of the Labor Code provisions and the IWC wage order." *Id.* "The precision of the time requirements set out in Labor Code section 512 and Wage Order No. 4 — 'not less than 30 minutes' and 'five hours per day' or 'ten hours per day' — is at odds with the imprecise calculations that rounding involves. The regulatory scheme that encompasses the meal period provisions is concerned with small amounts of time." *Id.* "Shortening or delaying a meal period by even a few minutes may exacerbate risks associated with stress or fatigue, especially for workers who are on their feet most of the day or

who perform manual labor or repetitive tasks." *Id.* at 669.

Rounding time punches for the purpose of timely meal breaks can never be neutral or in the employee's favor. "For purposes of calculating wages, counting slightly fewer minutes one day can be made up by counting a few more minutes another day. But the same is not true for meal periods. Under the applicable statute and wage order, a shorter or delayed meal period one day cannot be offset by a longer or earlier meal period another day. The premium pay scheme reflects the Legislature's and the IWC's determination that infringements on meal period requirements threaten employees' health and safety whenever they occur." *Id*. at 670. Indeed, "[r]ounding policies are at odds with the requirement that employers pay the full premium wage for meal period violations. When the actual times that an employee must work during a day reveal a meal period violation, the violation cannot be papered over by rounding." *Id.* at 670.

"By deeming delayed or shortened meal breaks as 'timely' and 'complete' when they are not, a rounding policy erodes the health and safety protections that the meal period requirements are intended to achieve." *Id*. at 671. This "concern applies to the timing of meal periods; the policy never triggers premium pay for early or on-time meal periods, but it does not always trigger premium pay for meal periods that are improperly delayed." *Id.* at 672.

Just like here, the defendant in *Donohue* "was already using an electronic timekeeping system . . . that recorded employees' unrounded time punches. The system could have kept track of potentially noncompliant meal periods using those unrounded time punches instead of rounding the punches to the nearest 10-minute increment." *Id.* Instead, this meant the employer and timekeeping system "actually had to take the extra step of converting the unrounded time punches to rounded ones; it is not clear what efficiencies were gained from this practice."

According to *Donohue*, this is illegal because an employee who shows up a few minutes early, but later has their meal records rounded to the closest hour ends up being several minutes late (i.e., 7:55 a.m. clock-in and 1:02 p.m. meal break is now at least seven minutes late, even though the records show 8:00 a.m. and 1:00 p.m.). In light of Leprino's uniform rounding policy and the class members' testimony that they show up early for work, this policy applies to all class members. As such, commonality is easily satisfied.

These types of claims are the "sort routinely, and properly, found suitable for class treatment." *Brinker*, at 1033. "The theory of liability—that [Leprino] has a uniform policy and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." *Id.*; *see also In re Taco Bell Wage and Hour Actions*, No. 1:07cv1314 LJO DLB, 2012 WL 5932833, at *5 (E.D. Cal. 2012) ("Numerous courts within the Ninth Circuit have held that commonality exists where a defendant's policy allegedly violates the meal requirements of California law.").

For example, in *Alberts v. Aurora Behavioral Health Care,* 241 Cal.App.4th 388 (2015) the plaintiffs "dispute[d] the 'facial legality of the [employer's] break policies." *Alberts*, 241 Cal.App.4th at 405. The meal period policy stated, "employees [were] entitled to 'an unpaid thirty minute break for a meal period, approximately half way between the beginning and ending of the employee's shift.' California law, however, requires that a meal period be provided during the first five hours of an employee's shift." *Id.* (citing *Brinker*, 53 Cal.4th at 1048–49). Coupled with class member testimony demonstrating late breaks, the court held that certification was appropriate under *Brinker*, and reversed the trial court's denial of class certification. *Id.*

Numerous other California authorities abound. *See, e.g.*, *Benton v. Telecom Network Specialists, Inc.* 220 Cal.App.4th 701, 726 (2013) (finding that plaintiff's theory of liability, namely that "[the defendant] violated wage and hour requirements by failing to adopt a policy authorizing and permitting meal and rest breaks to its technicians" was amenable to class treatment); *Faulkinbury v. Boyd Associates*, 216 Cal.App.4th 237 (reversing trial court's denial of certification of a class alleging rest break violations, holding that class-wide issues predominated because "[the defendant's] liability, if any, would arise upon a finding that its uniform rest break policy, or lack of policy, was unlawful"); *Bradley*, *supra*, 211 Cal.App.4th at 1149–54 ("Here, plaintiffs' theory of recovery is based on [the defendant's] (uniform) lack of a rest and meal break policy and its (uniform) failure to authorize employees to take statutorily required rest and meal breaks. The lack of a meal/rest break policy and the uniform failure to authorize such breaks are matters of common proof."); *Safeway, Inc. v. Superior Court of Los Angeles County*, 238 Cal.App.4th 1138, 1159 (2015) [explaining certification "does *not* require a showing that all—or virtually all—class members accrued unpaid meal break premium wages, but only that on a

24

system-wide basis, petitioners denied the class members [premium pay]."]; *Jaimez v. DAIOHS USA, Inc.* 181 Cal.App.4th 1286, 1304 (2010) (reversing denial of class certification because the trial court should have relied on the employees' common evidence that their delivery schedules made it difficult for them to take all of their required breaks and complete their deliveries within eight hours and many drivers testified that they did not take their breaks).

Here, Leprino has several uniform policies that ensure class members are never provided a meal period premium when their breaks are several minutes late.   For example, Leprino's pre-shift requirements require the class members to perform up to fifteen minutes of work while off-the-clock. *Supra*, fn. 15.  Leprino's timekeeping and tardy policies also require the class members to punch in up to seven minutes early prior to the start of their official shifts so they can arrive on time for the pre-shift meetings.  Dkt. 32-2, Ex. A; *supra*, fn. 2.  Finally, Leprino's uniform rounding policy effectively ensures that any of the time that *is* spent working within those seven minutes is counted against the class members for purposes of calculating pay and timely breaks.  Dkt. 32-2, Ex. L, Melo Depo. at 197:6–16, 204:10–24, 230:24–231:17.  As such, class members confirm they receive untimely meal breaks at the Tracy facility.  *Supra*, fn. 11.  Accordingly, common questions predominate on Plaintiff's first theory of recovery for his meal break claims.

### 3.     Common questions will drive the resolution of Plaintiff's "on-call" theory.

Plaintiff's second theory is that Leprino's policies and practices required employees to remain on-call during meal and rest breaks.  In *Augustus v. AMB Security Services, Inc.*, the California Supreme Court held that this requirement is *not* satisfied if an employer requires its employees to remain on-call during breaks.

> Employees forced to remain on call during a [meal or] rest period must fulfill certain duties:  carrying a device or otherwise making arrangements so the employer can reach the employee during a break, responding when the employer seeks contact with the employee, and performing other work if the employer so requests.   These obligations are irreconcilable with employees' retention of freedom to use [meal and] rest periods for their own purposes.

25

*Id.* at 270 (citing *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 585 (2000)). Employers who fail to provide duty free breaks must pay the employee "one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest period [was] not provided," which is called premium pay. Cal. Lab. Code § 226.7.

Here, Plaintiff's theory of classwide recovery for his meal and rest break claims is that Leprino requires the production workers at the Tracy plant to remain on-call during their breaks. This theory is supported by Leprino's common policies, several undisputed facts, and the testimony of class members. For example, Leprino emphasizes quality at the Tracy facility and expressly makes quality the class members' responsibility, effectively requiring them to watch the production line at all times. *Supra* at 9:20–10:23 and accompanying notes. Leprino also instructs them to always answer their supervisor's questions and follow their instructions, with no exceptions made for breaks. *See supra* at 11:1–5. Many workers are also assigned radios and are told they must carry it with them at all times, including their breaks. *See supra* at 11:6–12:6. Leprino also installed an intercom in the breakroom so workers could communicate with the floor while on break. *See supra* at 12:7–11. As such, as the class members confirmed, these policies and practices have created a culture of on-call breaks.

Again, "theory of liability—that [Leprino] has a uniform policy and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." *Brinker*, 53 Cal.4th at 1041; *accord Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) ("[C]ommonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."). At trial, the fact-finder merely needs to examine Leprino's common policies, the undisputed facts, and the class member testimony and determine whether Leprino had a practice of requiring on-call breaks.

Indeed, courts frequently certify cases based on similar common facts. For example, this Court recently certified two class actions alleging a similar on-call theory against the same Defendant. In *Vasquez v. Leprino Foods Company,* the plaintiffs alleged the employer's employment manual required "responsiveness to superiors' requests and instructions," stressed "over communication," required the class members to meet production quotas and avoid production delays, and issued radios to some, but not all, of the class members. *Vasquez*, No. 117CV00796AWIBAM, 2020 WL 1527922, at *15–16 (E.D. Cal. Mar.

31, 2020). Leprino argued these were general policies that did not relate to meal and rest break violations and that since many employees did not actually carry radios, commonality could not be met. *Id.* The Court disagreed on both fronts. "[T]he radio policies and practices, even though not directly applicable to non-carrying employees, may be reasonably considered by the factfinder as reflective or symbiotic of a facility-wide policy that prioritizes work above breaks." *Id.* "As for the policies about quotas, avoiding production delays, and responsiveness to superiors' requests and instructions, these policies are relevant to breaks because they can naturally and foreseeably encroach into break policies and practices." *Id.*

Similarly, in *Perez v. Leprino Foods Company*, the Court certified another on-call theory where Leprino instructed the employees to always follow supervisor directions, assigned some, but not all employees radios, and disciplined employees for production incidents that occurred while the employees were on break. *Perez v. Leprino Foods Co.*, No. 117CV00686AWIBAM, 2021 WL 53068, at *11 (E.D. Cal. Jan. 6, 2021). Leprino again argued the radio policy was not uniform and said not all employees recalled being contacted via the breakroom phone. *Id.* at *12. The court rejected those arguments, finding the plaintiff's "integrated theory does not depend" on these kinds of "piecemeal" challenges. *Id.* Instead, "even if an individual practice is not directly applicable to all employees—such as those who did not carry radios—evidence of that practice may be reasonably considered by the factfinder as one part of an environment where employees are effectively on-call at all times." *Id.* "This common question is central to Perez's claim and one that can be answered with common proof regarding common injury. If at trial the jury answers yes, then Leprino is liable to the class for meal and rest period violations; if the answer is no, then Leprino is not liable." *Id.* at *11.

In addition, in *Ayala v. U.S. Xpress Enterprises Inc.*, No. EDCV 16-137-GW(KKx), 2017 WL 3328087, at *10 (C.D. Cal. July 27, 2017), the plaintiff presented class member testimony "that [their employer] require[d] [them] to shoulder the affirmative responsibilities of securing their loads and responding to system alerts at all times," including breaks. He therefore argued that this amounted to "illegal 'on-call' breaks," and sought certification. *Id.* The employer responded by presenting testimony that "some [employees] dispute[d] whether or not [the employer] required them to perform these tasks." *Id.* The court found commonality (and predominance) satisfied. *Id.* It explained "liability will turn on whether 'securing the load' and responding to alerts messages rises to the level of employee control that

27

would turn any break periods provided into impermissible on call breaks." *Id.* "While the details of the individual [employees'] experiences may inform this inquiry, whether or not individual class members actually performed these tasks is secondary to whether [the employer's] policies placed the type of affirmative burden prohibited by *Augustus.*" *Id.*

Similarly, in *Antemate v. Estenson Logistics, LLC*, No. CV 14–5255 DSF (RZx), 2015 WL 3822267, at *2 (C.D. Cal. June 15, 2015), the plaintiff sought to certify a meal and rest break class based on his claim that his employer's "informal policies and practices create[d] an environment in which [employees] are routinely pressured not to take compliant breaks." In finding commonality, the court recognized that, "[e]ven assuming that individual questions will inevitably arise, [the plaintiff's] theory of liability—supported by multiple declarations and depositions—presents questions of law and fact common to the class. [The employer] either does or does not maintain these allegedly uniform policies and practices; if it does, a common legal question arises concerning whether this conduct violates California meal and rest break requirements." *Id.* at *3.

And in *Campbell v. Vitran Express Inc.*, the plaintiffs alleged their employer "implemented an unofficial policy of discouraging and denying its [employees] meal and rest breaks." 2015 WL 7176110 at *1. For common proof, plaintiffs submitted declarations stating their employer did not provide them with breaks, falsified their time records, and "issued premium pay for missed meal breaks on less than five occasions." *Id.* at *7. Relying on this evidence, the court concluded there was "common questions of law and fact arising from [the employer's] alleged practice of violating California labor law and unfair competition laws relating to meal and rest breaks." *Id.* at *4. The employees' "claims stem from the same source in that they were all employed . . . during the relevant class period, and they were all subject to the same unofficial policy." *Id.*; *see also e.g., Jaimez v. DAIOHS USA, Inc.*, 181 Cal. App. 4th 1286, 1304–05 (2010) (finding commonality and predominance based on evidence that scheduling policy and workload "made it extremely difficult" for employees to both timely complete their work and take all required breaks and there was no evidence that premium pay was ever paid).

### 4. Common questions will drive the resolution of Plaintiff's "on duty" meal period claim.

"An 'on-duty' meal period shall be permitted only when the nature of the work prevents an

employee from being relieved of all duty and when by written agreement the parties an on-the-job paid meal period is agreed to." *Brinker*, 53 Cal.4th at 1035.  Ultimately, **the employer** has the burden to 'establish the facts that would justify an on-duty meal period," meaning the nature of the work prevents them from being relieved of all duty. *Abdullah*, *supra*, 731 F.3d at 961.

To determine whether the "nature of the work prevents them from being relieved of all duty," the DLSE set forth several factors. They include: "(1) [T]he type of work, (2) the **availability of other employees** to provide relief to an employee during a meal period, (3) the potential consequences to the employer if the employee is relieved of all duty, (4) the **ability of the employer to anticipate and mitigate these consequences such as by scheduling the work in a manner that would allow the employee to take an off-duty meal period**, and (5) whether the work product or process will be destroyed or damaged by relieving the employee of all duty." *Id.* (emphasis added).

Leprino's 30(b)(6) witness confirmed there is nothing about the nature of the work that prevents the class members from actually being relieved for a proper break.  Dkt. 32-2, Ex. K, McDaniel Depo. at 222:19–223:3.  As such, for the employees who worked pursuant to a straight 8 shift under the on-duty meal period agreements, this claim should be certified.

### C.    Plaintiff's claims are typical of the claims and defenses of the class.

Typicality requires "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Although the 'commonality and typicality requirements . . . tend to merge,' each factor serves a discrete purpose.  Commonality examines the relationship of facts and legal issues common to the class members, while typicality focuses on the relationship of facts and issues between the class and its representatives." *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 613 n.37 (9th Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 2541 (2011).  In other words, typicality tests whether the other members of the class " 'have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Parsons*, 754 F.3d at 685 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  Here, Plaintiff's claims arise out of the same course of conduct—i.e., the alleged on-call breaks, facially invalid policies, and pre-shift duties—as the other class members.  *See generally* Dkt. 32-4.  Typicality is satisfied.

### D.     Plaintiff and his counsel are adequate.

Adequacy of representation requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether the representation meets this standard, [courts] ask two questions:  (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Here, there are no conflicts between Plaintiff and the class. Dkts. 84-4. Plaintiff also understands his role in this case, *id.*, and has hired experienced counsel who will fairly, responsibly, and vigorously represent the interests of the class, *id*. Adequacy is therefore satisfied.

## II.     RULE 23(B)(3) IS SATISFIED.

Since the four prerequisites of Rule 23(a) are satisfied, Plaintiff need only demonstrate his proposed class fits into one of three categories described in Rule 23(b). *Bateman*, 623 F.3d at 712. Here, Plaintiff seeks certification under (b)(3), which has two requirements:  (1) predominance and (2) superiority. *See* Fed. R. Civ. P. 23(b)(3). Both are satisfied.

### A.     Common questions predominate over any purported individualized issues.

Predominance requires the "questions of law or fact common to the class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This requires courts to " 'focus[ ] on "the relationship between common and individual issues" in the case' and test[ ] whether the proposed class is ' "sufficiently cohesive to warrant adjudication by representation." ' " *Abdullah*, 731 F.3d at 964 (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013)). Therefore, by its own terms, predominance does not require a plaintiff to " 'establish that there are no individualized issues, only that the class issues predominate.' " *Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 594 (D. Or. 2013) (quoting *Phelps v. 3PD, Inc.*, 261 F.R.D. 548, 559 (D. Or. 2009)).

District courts engage in this analysis by "compar[ing] the issues subject to common proof against the issues subject solely to individualized proof." 1 William Rubenstein et al., *supra*, § 4:50; *accord Sav-on*, 34 Cal. 4th at 334 ("Predominance is a comparative concept . . . ."). This comparison is "more than just count[ing] up common issues and individual issues." *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 470 (N.D. Cal. 2014); *accord Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (recognizing

30

the predominance inquiry is not "bean counting").  Rather, "the inquiry is pragmatic and qualitative and focuses on whether common questions present the overriding issues in a suit." *Patel v. Trans Union, LLC*, 308 F.R.D. 292, 308 (N.D. Cal. 2015); *accord Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 559 (D. Idaho 2010) ("Predominance is determined not by counting the number of common issues, but by weighing their significance.").  So, " '[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication,' " predominance is satisfied because " 'there is clear justification for handling the dispute on a representative rather than on an individual basis.' "  *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1778 (2d ed. 1986)).  Conversely, when " 'the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues,' " class treatment becomes inappropriate.  *Cooper v. S. Co.*, 390 F.3d 695, 722 (11th Cir. 2004) (alterations in original) (quoting *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996)).

Notably, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)," especially in a wage-and-hour case. *Levya v. Medline Indus., Inc.* 716 F.3d 510, 514 (9th Cir. 2013); *see also Wal-Mart*, 131 S.Ct. at 2558 ("[I]ndividualized monetary claims belong in Rule 23(b)(3)").  "[D]amages determinations are individual in nearly all wage-and-hour class actions," and therefore any rule precluding certification " 'on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device.' "  *Levya*, 716 F.3d at 513–14 (quoting *Brinker*, 53 Cal. 4th at 354).  Indeed, courts regularly certify "issue" classes under Rule 23(c)(4) "to separate the issue of liability from damages." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006); *see also* Fed. R. Civ. P. 23(c)(4) advisory committee notes (noting, as an example, in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims").

Here, there are no individual issues for any of Plaintiff's classwide claims—let alone an individual issue that could predominate over the identified common questions.   All classes here are "entirely cohesive:  [They] will prevail or fall in unison.  In no event will the individual circumstances of particular [subclass] members bear on the inquiry." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184,

31

1191 (2013).   Take, for example, Plaintiff's claim that Leprino's uniform rounding policy results in untimely meal periods.   This claim can easily be determined on a classwide basis because Leprino admitted it specifically tracks the class members' actual punch times and can compare it to the rounded time to see if the rounding policy resulted in late breaks.   Moreover, the California Supreme Court has explicitly found this kind of claim can be resolved on a representative basis.   "Representative testimony, surveys, and statistical analysis, along with other types of evidence, are available as tools to render manageable determinations of the extent of liability" for rounding claims. *Donohue*, *supra*, 11 Cal.5th at 77.   To the extent there are individualized damages, this does not preclude certification.

In addition, Plaintiff's claim that the production workers were on-call during their meal and rest breaks rises and falls in unison.   If the breaks were on-call, then *all* the class members' claims prevail.   If it was not, then they *all* lose.   *Perez v. Leprino Foods*, 2021 WL 53068, at *16 ("If the factfinder determines [these policies "effectively place all putative class members on call during their breaks"], then [the employer] is liable across the board.")).   Ultimately, "the question of whether Leprino's policies and practices put the class members on call during their breaks is capable of class-wide resolution, and this is because the 'determination of [the question's] truth or falsity will resolve an issue that is central to the validity of each' member's meal and rest break claim 'in one stroke.' " *Vasquez*, 2020 WL 1527922, at *15 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350).   There are no individualized inquiries because "Plaintiffs' theory is not focused on the reason for each interruption to each employee's many breaks.   Rather, the focus is on facility-wide policies and practices: namely, did those policies and practices effectively place all putative class members on call during all breaks?   If the factfinder says yes, then Leprino is liable across the board." (*Id.* at *16.)   In no situation would the Court need to look to the individual experiences of each class member to determine classwide liability.

Damages can again be calculated by comparing representative testimony to the number of shifts entitled to breaks and whether premiums were paid because "[Leprino's] payroll records contain that data." (*Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 405 (C.D. Cal. 2008).)

**B.**      **Class treatment is superior to litigating more than hundreds of individual cases.**

Superiority requires the plaintiff to demonstrate that class treatment "is superior to other available methods" of adjudication. Fed. R. Civ. P. 23(b)(3).   " '[T]he purpose of the superiority requirement is to

32

assure that the class action is the most efficient and effective means of resolving the controversy.' " *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1779 (3d ed. 2005)).  A class action is superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Courts have widely recognized that class actions alleging an employer systematically violated California's wage-and-hour laws are particularly well-suited for class treatment.  *See Bradley*, 211 Cal. App. 4th at 1141 ("This state's public policy supports the use of class actions to enforce California's [wage-and-hour] laws for the benefit of workers.").

Here, because common questions of law and fact predominate, judicial economy and the parties' resources will be furthered by class treatment.  As explained above, classwide liability can be established by adjudicating Plaintiff's common questions, and these common questions predominate over any purported individualized issues.  Therefore, rather than conducting over hundreds of individual mini-trials for each production worker, it makes more sense to prove the elements of liability through common proof.  Class treatment is clearly superior.

## **CONCLUSION**

As explained above, Plaintiff has satisfied the procedural requirements for certification under Federal Rule of Civil Procedure 23.  The Court should therefore grant Plaintiff's motion and certify the class.

Date:  February 4, 2022

**PARRIS LAW FIRM**

By:   /s/ *Ryan A. Crist*
R. Rex Parris
Kitty K. Szeto
John M. Bickford
Ryan A. Crist

Attorneys for Plaintiff
and the Putative Class

33