R. Rex Parris (SBN 96567)
    rrparris@parrislawyers.com
Kitty K. Szeto (SBN 258136)
    kszeto@parrislawyers.com
John M. Bickford (SBN 280929)
    jbickford@parrislawyers.com
Ryan A. Crist (SBN 316653)
    rcrist@parrislawyers.com
**PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:    (661) 949-2595
Facsimile:    (661) 949-7524

Eric Rouen (SBN 242341)
    rouenlaw@att.net
**THE DOWNEY LAW FIRM**
9595 Wilshire Blvd., Suite 900
Beverly Hills, California 90212
Telephone:    (213) 291-3333
Facsimile:    (610) 813-4579

Attorneys for Plaintiff and the Putative Class

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| CHARLES BATES, an individual, on behalf of himself and all members of the putative class;<br><br>Plaintiff,<br><br>v.<br><br>LEPRINO FOODS COMPANY, a Colorado Corporation; LEPRINO FOODS DAIRY PRODUCTS COMPANY, a Colorado Corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 2:20-CV-00700-AWI-BAM<br><br>**CLASS ACTION**<br><br>**DECLARATION OF CHARLES BATES IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:    August 29, 2022<br>Time:    1:30 p.m.<br>Courtroom:    #2, 8th Floor<br>Judge:    Anthony W. Ishii<br><br>Complaint Filed:    February 28, 2020<br>Trial Date:    None Set |

## DECLARATION OF CHARLES BATES

I, Charles Bates, declare as follows:

1. I am over eighteen years of age and a resident of Manteca in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2. I have worked for Defendant Leprino Foods Company ("Leprino") as an hourly worker from about August 2017 to February 2018. During that time, I have always worked at Leprino's facility or plant located in Tracy, California.

3. While I was employed by Leprino, I worked as a TRA Processing Operator Relief in Leprino's Processing Department. During my employment, my primary job duties consisted of loading stacks of cheese onto moving conveyors, folding bags into boxes, inspecting and monitoring the cheese for quality, assisting during machinery shutdowns on the production line.

4. My highest level of education is high school. However, I have had significant experience working as a Forklift Driver in the past, as well as being the former owner of a janitorial services company. I did not have legal training, so I sought out experienced lawyers to help bring this case on behalf of myself and the other employees at Leprino. I have worked closely with my attorneys to pursue this case, and I am aware of the facts and allegations made in this lawsuit. I understand that this is a case where Leprino did not follow or comply with certain labor laws that applied to employers in California. For example, Leprino required employees to respond to their supervisors and foremen while on their breaks, but did not pay them for interrupted breaks or breaks where we had to stay responsive to our superiors. I believe we did not receive proper compensation, and that Leprino did not fairly pay us all wages associated with not being given our breaks. Also, Leprino did not pay me and other employees for the time that we spent putting on and taking off the required equipment, because we had to do so before clocking in to work. Because Leprino had a strict policy on being on time for a shift (and that being even one minute late would subject me to warnings or discipline), Leprino did not pay me and other employees for time that we had to spend getting ready for the start of our shifts. Also, Leprino told us to clock no earlier than seven minutes before the start of the shifts, but did not pay us for those minutes before the start of the shift. Likewise, Leprino told us to clock out no later than seven minutes after the

1  end of our shifts, but did not pay us for those minutes either.  This was the result of Leprino having a
2  policy that rounded time against me and my fellow employees.  I also understand that this lawsuit seeks
3  to put a stop to Leprino continuing these practices.

4  5.  While working at Leprino, I received training on several of Leprino's policies and
5  procedures, which I had to follow or risk discipline.  I was trained to arrive and punch in before my shift,
6  because punching in one minute late was considered grounds for discipline.

7  6.  I worked many different shifts, but most of my shifts officially began at 8:00 p.m. and
8  ended at 4:00 a.m.  I would normally have to arrive to work around 25 minutes before the start of my
9  official shift in order to make sure that I have enough time to perform my pre-shift duties.  I would first
10 park my car in the employee parking lot, which is located across the facility.  I would then have to walk
11 across the street in order to get to the facility.  Parking my car and walking over usually takes me up to
12 five minutes.

13 7.  I would then have to punch in a code to enter the building.  Once inside, I went to the
14 break room to put my lunch in one of the refrigerators.  Because many workers came in at the same time,
15 I frequently had to stand in line before I could walk into the break room and put my food inside the fridge.
16 When I put my food away, I would walk to the clean uniform lockers.  Entering the building, dropping
17 off my lunch, and walking to uniform lockers took me around seven minutes.

18 8.   I would walk down the hallway to where the clean uniform lockers were located.  My
19 uniform locker would contain the cleaned uniform, which I had to wear for work.  The uniform consists
20 of a shirt, pants, helmet, and boots. Given that there would be a line of workers picking up their uniforms
21 at the same time, I had to wait until there was enough space for me to even access my locker.  Once I
22 picked up my uniform, I would then go to men's changing lockers.  Picking up my uniform and walking
23 to the changing locker room would take around three to four minutes.

24 9.  When I go to the changing room, I begin the process of changing out of my street clothes
25 and dressing into my uniform.  First, I put in my combination to open my personal locker and then
26 changed out of my street clothes.  I then put on my company-issued pants, shirt, helmet, glasses, earplugs,
27 and boots.  It took me up to 10 minutes to change into my uniform because other workers were changing
28 at the same time, leaving too little space for each other.

10. Once dressed, I then usually waited in line to clock into work at seven minutes before my scheduled shift started. In order to clock-in, I had to stand in line by the time-clock stations, formed by employees trying to clock-in at the same time. To clock-in, I had to enter my employee identification number and then place my finger on a fingerprint scanner. I would usually make my time entry around seven to four minutes before my official start time. Clocking in could easily take up to two to three minutes because there were several people in line and because the scanners would have issues.

11. Even though I was allowed to clock in seven minutes before my shift started to complete my pre-shift duties, this amount of time was not enough. I performed numerous pre-shift duties, prior to clocking in, because putting on my uniform, lining up for work, and getting ready for the start of my shift took much more than seven minutes.

12. Before arriving for the pre-shift meeting, I still had to go through Leprino's redline sanitation room in order to not bring bacteria or other contaminants onto the production floor. I had to thoroughly wash and scrub my hands, as well as clean my boots. Then I would have to apply hand sanitizer solution to fully disinfect my hands. In addition, I usually wore earplugs and a beard net before exiting the redline sanitation room. It would take up to seven minutes for me to complete the sanitation procedures.

13. After completing the sanitation procedures, I would walk to my pre-shift meeting. This walk usually took me about three minutes. I needed to get to the pre-shift meeting area at the start of the shift, because the meeting would often start right at the beginning of my official shift. If I didn't arrive on time for the pre-shift meeting, it could lead to disciplinary action such as a verbal warning or even a write up.

14. When my shift ended, I was not allowed to leave my post until another employee relieved me. Normally, the employees were supposed to arrive a few minutes prior to the end of my shift to allow me enough time to give the employee a passdown, and to give me enough time to walk back to the locker room, change out of my uniform, and clock out.

15. A passdown is a recap of the events that took place during the shift I worked. During a passdown, I would let my relief person know the tasks that I had accomplished and any problems encountered throughout the shift. Doing a passdown could take up to five minutes to explain everything.

16. Once I completed the passdown, I rushed to the main facility to clock out. This is because Leprino's policy discouraged us from clocking out beyond the seven minutes after our shift ends. However, I was often relieved too late from my post, so I did not have enough time to walk to the main facility, change out of my uniform, and clock out within seven minutes after the shift. Because of this, I had to clock out first, then head to the locker room to change out of my uniform and dress into my street clothes.

17. After clocking out, I would walk to my personal locker, enter my combination, take off my uniform, and change into my personal clothes. I would place my boots and helmet in my personal locker, then put my uniform in a dirty laundry bin as required under Leprino's policy. It took me about five to six minutes to change out of my uniform and into my street clothes. I do not believe Leprino paid me for the time I spent changing into my personal clothes, because I had to clock out before this process.

18. When I was done changing into my street clothes, I walked to the laundry bin to drop off my uniform for cleaning. This took me around three minutes. This meant that I exited Leprino's building at around 4:10 a.m. to 4:15 a.m.

19. My job duties frequently interfered with my ability to take my rest breaks and meal breaks on time. For example, as part of my job duties, I had to be on the lookout and be responsive to bulk-off incidents, when a part of the production line would go off, leaving large quantities of cheese stuck on the conveyor belt. Leprino constantly emphasized that during these bulk-off incidents, our top priority was to save as much product as possible from spoilage. This meant that I routinely could not take my meal and rest breaks while being relieved of all duty. I had to be ready to react to any issues that occurred with the production line and my work areas, even while I was on my breaks. Given the above, I was constantly alert to perform any tasks that could save as much cheese as possible whenever machinery broke down, even if it would be during my breaks. Although Leprino allowed two minutes of walking time as a cushion for our meal breaks and rest breaks, it was not enough to enjoy a full 10-minute rest break or a 30-minute meal break. It took me around four minutes to get to the break room where I took my rest and meal breaks, and another six minutes on my way back because I had to go through the redline sanitation room all over again. Redline sanitation procedures included cleaning my boots, thoroughly

washing and air drying my hands, and applying sanitizing solution. I had to go through each of those steps before I could return from a rest break or a meal break.

20. I also carried a radio and had to keep it on me and on at all times. I was often interrupted during my breaks by calls from supervisors or foremen. Leprino never trained me to turn off my radio or told me I shouldn't answer it during my breaks. Instead, when someone called on the radio, I was supposed to answer, even if I was on break. For instance, if someone called me on the radio and needed help, I would then have to respond. Having a radio meant that I had to be ready to stop my break and respond to work-related questions.

21. My interests as a named plaintiff in this lawsuit are not adverse to the interests of the other employees. I do not have any conflicts with any of the other employees at Leprino, and I never intend to. I also do not see any conflicting interests arising in the future. I understand how important it is for me not to jeopardize their interests in this case because it is a class action, and not just my individual case. I brought this case so I could help the other employees correct the legal wrongs I believe Leprino committed. If I did not think that I could help my fellow co-workers adequately, I would not have taken the lead on this case.

22. I have always put the best interests of the other employees first while performing my duties as a potential leader in this case. I have been committed to strongly advocating for this case on behalf of myself and the other employees. I have been in contact with my attorneys to stay updated on what is going on in this case, to answer any questions about my experience working for Leprino, and to answer discovery questions.

23. I seek to be a lead representative for this lawsuit. After fully discussing this role with my attorneys, I understand that a representative must:
    a. represent the interests of all members of the class in the case;
    b. have a claim that is similar of those of the class and have been injured by the same acts by Leprino;
    c. consider the interests of the class just as they would consider their own interests and in some cases must put the interests of the class before their own interests;

      d.    actively participate in the lawsuit, as necessary, by, among other things, answering questions, producing documents to Leprino, and giving trial testimony if required;

      e.    may be required to travel to give such testimony;

      f.    recognize and accept that any resolution of the lawsuit, by dismissal or settlement, is subject to court approval, and must be designed in the best interest of the group of employees as a whole;

      g.    are not required to be particularly sophisticated or knowledgeable about the subject of the lawsuit;

      h.    should follow the progress of the lawsuit and should provide all relevant facts to the lawyers for the class; and

      i.    volunteer to represent or champion many other people with similar claims and injuries because of the importance of the case and the need that all class members benefit from the lawsuit equally, and as a result, the savings of time, money and effort should benefit all parties and the court.

24. To date, I have performed several tasks in my role as a class leader, including:

      a.    seeking out and meeting with my attorneys to discuss the facts of the case;

      b.    reviewing documents;

      c.    reviewing and responding to written discovery;

      d.    keeping in contact with my attorneys regarding the status of the lawsuit and providing my counsel with any information or documents they request.

25. It is my understanding that the class members are positioned similarly on the issues in this case and their experiences with Leprino's common policies and practices. I have always believed this, which is what made me seek out class action lawyers to help me with this case.

26. It is my understanding that these kinds of cases help to ensure companies comply with the law, especially where an individual injury might be small compared to the possible legal fees associated with pursuing an individual case. Here, I truly believe that by starting this case, I can help encourage

Leprino to stop its unlawful practices and give up the profits and advantages that it received from such practices.

27. Thus, I anticipate and hope that Leprino will stop the practices described in my case so that other employees do not have to go through the same scenarios the other employees and I had/have to endure. To that end, it is very important to me that I work with my attorneys to help achieve the best result possible for the class.

28. I do not have any interests which are inconsistent with or adverse to the interests of the other employees, and I will make an adequate leader of the class. I have brought this lawsuit on behalf of myself and all others in a similar situation to correct legal wrongs I believe Leprino has committed and is still committing. I believe the legal and factual issues present in this case are applicable to both myself and the employees that I seek to represent.

I declare under penalty of perjury under the laws of the United States of California that the foregoing is true and correct.

Executed on this 31st day of January 2022, at Manteca, California.



Charles Bates