1

2

3                    UNITED STATES DISTRICT COURT

4                    EASTERN DISTRICT OF CALIFORNIA

5

6   **FRED WALTER, an individual, on**          CASE NO. 2:20-CV-00700-AWI-BAM
    **behalf of himself and all members of the**
7   **putative class**

8                                               **ORDER ON PLAINTIFF'S MOTION**
                **Plaintiff,**                  **FOR CLASS CERTIFICATION**
9
                    v.                          (Doc. No. 32)
10
    **LEPRINO FOODS COMPANY, a**
11  **Colorado Corporation; LEPRINO**
    **FOODS DAIRY PRODUCTS**
12  **COMPANY, a Colorado Corporation;**
    **and DOES 1–100, inclusive,**
13
                **Defendants.**
14

15

16         Pending before the Court is Plaintiff Fred Walter's motion for class certification.  Doc. No.

17  32.  Charles Bates filed suit against two cheese manufacturing companies, Leprino Foods

18  Company and Leprino Foods Dairy Products Company (collectively, "Leprino"),[1] alleging

19  violations of California's wage and hour laws for unpaid meal and rest period premiums, unpaid

20  minimum wages, untimely wage payments, non-compliant wage statements, and violations of

21  California's unfair competition law.  Doc. Nos. 1 & 7.  After the Court dismissed Bates' request

22  for statutory penalties for his wage statement claim, and for restitution for his unfair competition

23  law claim, Doc. No. 25, Bates filed the instant motion for class certification.  Doc. No. 32.  Bates

24  thereafter filed a motion to substitute class representative, seeking to substitute Fred Walter in for

25  Bates as the putative class representative, and withdrew his declaration in support of his motion

26  ──────────────────

27  [1] In their class certification briefing, the parties, including both Defendants (responding as one), make no distinction
    between the Leprino entities.  Rather, the parties treat both Defendants as if they are a single "Leprino" entity.  The
28  Court will adopt that practice in this order.

for class certification.  Doc. Nos. 40 & 41.  Bates's motion to substitute attached as an exhibit a copy of the proposed Second Amended Complaint ("SAC").  Doc. Nos. 40 & 40-2.  In light of Bates' motion to substitute, the Court continued the filing deadline for Defendants' class certification opposition to 45 days from service of a ruling on Bates' motion to substitute.  Doc. No. 43.  On August 16, 2022, the Court granted Bates leave to amend the operative complaint to substitute Walter in for Bates, allowed Leprino to depose Walter up to an additional seven hours regarding his role as putative class representative without it counting as an additional deposition against Defendants' ten deposition limit, and ruled that the Court will set the class certification end period to August 29, 2022 if the Court grants class certification in this case.  Doc. No. 52. Walter thereafter filed the SAC, Doc. No. 60, and Leprino filed its Answer.  Doc. No. 61.  On September 30, 2022, Leprino filed its class certification opposition, Doc. No. 56, and on December 29, 2022, Plaintiff filed his class certification reply.  Doc. No. 57.[2]

Having reviewed and considered all the briefing and evidence submitted by the parties, the Court will grant in part and deny in part Walter's motion for class certification.

## **BACKGROUND**

Based on the parties' briefing and evidence, the facts for purposes of adjudicating the certification motion are as follows.  Gomez v. J. Jacobo Farm Labor Contractor, Inc., 334 F.R.D. 234, 242 (E.D. Cal. 2019) (citing In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 313 (3d Cir. 2008) ("Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.")).

---

[2] Also before the Court is Defendants' Request for Court Guidance.  Doc No. 58.  In this filing, Defendants note that they are unsure whether the separate Objections document (Doc. No. 57-2) that Plaintiff filed alongside his Reply brief (Doc. No. 57) will be considered by the Court.  If the Court considers the Objections document, Defendants request an opportunity to respond to it to "correct the record."  Because Defendants do not explain what they mean by "correct the record," the Court interprets Defendant's Request as a request to file a sur-reply, which the Court will deny.  See Camposeco v. Boudreaux, 2021 U.S. Dist. LEXIS 195447, *12 (E.D. Cal. Oct. 7, 2021); Willard v. Neibert, 2016 U.S. Dist. LEXIS 166201, *4 (E.D. Cal. Dec. 1, 2016). To the extent Leprino believes or is arguing that the Objections document is improperly raising new evidence or arguments in a Reply belief, the Court acknowledges that presenting new arguments and evidence in a Reply brief is improper.  Therefore, if Walter presented truly new evidence or arguments in the Objections document, the Court will not consider them.  JG v. Douglas Cty. Sch. Dist., 552 F.3d 786, 805 (9th Cir. 2008).  Additionally, to the extent Walter's Objections document is inviting the Court to strike any of the challenged declarations and testimony presented by Leprino, the Court will decline Walter's invitation. See Howell v. Leprino Foods Co., 2022 U.S. Dist. LEXIS 34078, *2 (E.D. Cal. Feb. 24, 2022); Perez v. Leprino Foods Co., 2021 U.S. Dist. LEXIS 2165, *53 (E.D. Cal. Jan. 6, 2021).

Leprino manufactures and processes cheese and dairy ingredients at its Tracy facility in Tracy, California.  The Tracy facility, which is one of several Leprino facilities in the State of California, generally operates twenty-four hours a day, seven days a week, and employs over 300 employees.  Unlike Leprino's other facilities, the Tracy facility operates a single production line that runs through the facility's production departments.  Due to the time sensitive nature of making its cheese, Tracy's production line generally does not stop running except for routine cleaning or emergencies.

Work Shift Policies and Practices

Each shift for Leprino's hourly employees is scheduled for approximately 8.5 hours including a 30-minute non-paid period reserved for meals.  Leprino's corporate policy provides that non-exempt hourly employees "must not work while not on the clock or be on the clock (punched in) while not working."  Every hourly employee is required to comply with the same time clock and time punch procedures outlined in Leprino's Handbook.  Leprino's time clocks record the exact hour and minute of each punch, but for purposes of payroll, the time punches of hourly employees are rounded to the nearest quarter hour, meaning that a time punch at 7:53 a.m. would be rounded up to 8:00 a.m. and a time punch at 7:52 a.m. would be rounded down to 7:45 a.m.  These employees are subject to discipline if they punch in more than seven minutes before the start of their shifts or punch out more than seven minutes after the end of their shifts because in either situation unauthorized overtime pay would be generated.

Leprino tracks its employees' lateness and absences pursuant to an Attendance Policy. Leprino's hourly employees are required to punch in by the start of their shifts, and punching in just a minute after their scheduled start times is grounds for discipline.  Hourly employees regularly arrive and punch in up to seven minutes before their scheduled start times.  Leprino also requires many hourly employees to put on uniforms and protective equipment and to wash their hands and sanitize in a redline room before proceeding with their work assignments.  Leprino's corporate policy requires non-exempt hourly employees to change into and out of uniform while on the clock.  Some employees arrive twenty to thirty minutes before their scheduled start times, change into their gear, and then punch in during the seven-minute pre-shift period.

1     <u>Meal and Rest Break Policies and Practices</u>

2          Teamsters Local No. 439 represents Tracy's hourly employees, and a collective bargaining

3     agreement ("CBA") primarily governs the terms and conditions of their work.  The CBA includes

4     a "meal period" provision that grants each hourly employee "a meal period not more than five (5)

5     hours after the beginning of his or her shift."[3]  Additionally, the CBA includes a "rest period"

6     provision that provides each hourly employee with a "rest period of reasonable duration (15

7     minutes) in accordance with present practices during the first and second half of work of an eight

8     (8) hour shift."[4]  If Leprino interrupts an employee with a work-related matter during a meal or

9     rest break, then the employee is entitled to a premium payment, another break, or both.

10          Many hourly employees have break relief, which means other workers come in to take

11    over their duties while they go on break.  However, according to several putative class members,

12    hourly employees must still remain on-call during their breaks to attend to quality and production

13    line issues.  Due to the importance of the production line's continuous operation, hourly

14    employees are allegedly required to shift their responsibilities to attend to the production line

15    whenever an issue arises.  For example, when excess cheese builds up on the production line,

16    hourly employees must take off the cheese temporarily through a process called "binning" or

17    "bulking off" to prevent spillage onto the floor.  In-person, radio, and intercom communications

18    are used to alert employees when immediate assistance is needed.  According to several putative

19    class members, hourly employees have to be ready and willing to respond to supervisors at all

20    times, even during meal and rest breaks.

21    _____

[3] The CBA's meal period provision states:
22          Except in emergencies, each employee shall be granted a meal period not more than five (5) hours after the
          beginning of his or her shift. The meal period shall not be paid time unless the Employer, because of the
23          nature of the work, requires an on-duty meal period, which shall be paid time. Any employee who is required
          by the Employer to delay his or her meal period more than five (5) hours after the beginning of his or her
24          shift shall be compensated at one and one-half times the rate of pay from the fifth hour until the meal period
          is taken. The employee will return to straight time after the meal period is taken. Other arrangements for
25          mealtime may be made by mutual agreement between the Employer and the Local Union.

26    [4] The CBA's rest period provision states:
          All bargaining unit employees shall receive a rest period of reasonable duration (15 minutes) in accordance
27          with present practices during the first and second half of work of an eight (8) hour shift. The Employer shall
          not schedule an employee for a rest period during the first hour of work. When an employee is told or
28          scheduled to work nine (9) or more hours he or she shall receive an additional rest period between the eighth
          and ninth hours.

4

**LEGAL STANDARD**

A class action is a procedural mechanism that allows for representative litigation. Amchem Prods. v. Windsor, 521 U.S. 591, 613-19 (1997).  This means that one or more class members may "litigate on behalf of many absent class members, and those class members are bound by the outcome of the representative's litigation."  1 William Rubenstein, Newberg on Class Actions § 1:1 (5th ed. 2012) [hereinafter, "Newberg on Class Actions"] (citing Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 363 (1921)).  "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–01 (1979)).

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure, which imposes a two-step test for deciding whether a class may be certified.  Under the first step, the court determines whether the moving party has established four perquisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4).  If the prerequisites of Rule 23(a) are met, the court considers whether the proposed class action meets at least one of the three provisions of Rule 23(b).  Fed. R. Civ. P. 23(b).  Relevant here, Rule 23(b) states that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

A party moving to certify a class action bears the burden of affirmatively demonstrating compliance with Rule 23.  Comcast, 569 U.S. at 33.  "The Rule 'does not set forth a mere pleading standard,'" but instead demands the moving party establish through evidentiary proof that the proposed class action satisfies the prerequisites of Rule 23(a) and one of the provisions of Rule 23(b).  Id. (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)).  Courts generally require the moving party to demonstrate by a preponderance of the evidence that class certification

is appropriate.  Newberg on Class Actions § 7:21 (citing cases, including Martin v. Sysco Corp., 325 F.R.D. 343, 354 (E.D. Cal. 2018) ("While Rule 23 does not specifically address the burden of proof to be applied, courts routinely employ the preponderance of the evidence standard.")).

To ensure the moving party has "satisfied" its burden, the district court must conduct a "rigorous analysis." Comcast, 569 U.S. at 33.  Because the "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," this rigorous analysis may include "prob[ing] behind the pleadings" and "overlap with the merits of the plaintiff's underlying claim." Id. at 33–34.  Yet, "'[n]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies' Rule 23." Sali v. Corona Reg'l Med. Ctr., 909 F.3d 996, 1004–05 (9th Cir. 2018) (quoting Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975)).  Ultimately, the decision to grant or deny a motion for class certification under Rule 23 is committed to the broad discretion of the trial court. Bateman v. Am. Multi–Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010).

## DISCUSSION

### A.   Class Definition

Rule 23 implicitly requires the proposed class to be ascertainable by reference to objective criteria, at least for class certification under Rule 23(b)(3). See Marcus v. BMW of North America, LLC, 687 F.3d 583, 592-93 (3d Cir. 2012); Jones v. ConAgra Foods, Inc., 2014 U.S. Dist. LEXIS 81292, 2014 WL 2702726, *8 (N.D. Cal. 2014); Lilly v. Jamba Juice Co., 308 F.R.D. 231, 236 (N.D. Cal. 2014); Newberg on Class Actions § 3:1.  While courts have "ascribe[d] widely varied meanings" to the term "ascertainability," Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 (9th Cir. 2017), there are three linguistic formulations commonly used to express the test for definiteness:

> [F]irst, that the class must be "precise, objective, and presently ascertainable"; second, that the class must be "adequately defined and clearly ascertainable"; and third, that the class can be ascertained "by reference to" or "based on" "objective criteria."

6

Newberg on Class Actions § 3:3 (citations omitted).

The ascertainability requirement "protects absent plaintiffs in two ways — by enabling notice to be provided where necessary and by defining who is entitled to relief; and a definable class protects defendants by enabling a final judgment that clearly identifies who is bound by it." Id. at § 3:1. The movant for class certification bears the burden of sufficiently pleading a sufficiently ascertainable class. See Whitaker v. Bennett Law, PLLC, 2016 U.S. Dist. LEXIS 122873, 2016 WL 4595520, at *1 (S.D. Cal. 2016); Brazil v. Dell Inc., 585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008); Newberg on Class Actions § 3:3. While the ascertainability requirement provides for an "objectively ascertainable" class, the Ninth Circuit does not require that the proposed class also be "administratively ascertainable." Briseno, 844 F.3d at 1123-26. "Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry." Newberg on Class Actions § 3:3.

Walter seeks certification of the following class:

> All non-exempt hourly workers who are currently employed, or formerly have been employed, as non-exempt hourly employees at Leprino's Tracy plant in Tracy, California, at any time within four years prior to the filing of the original complaint until August 29, 2022.[5]

The contours of the class are ascertainable based on objective criteria, namely, whether someone was employed by Leprino as a non-exempt hourly employee at the Tracy facility. Leprino does not contest that the proposed class is ascertainable. Accordingly, the Court finds that the proposed class is ascertainable.

**B.   Numerosity**

Pursuant to Rule 23(a)(1), a class action is maintainable only if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In general, courts find the numerosity requirement satisfied when a class includes at least 40 members. Pena v. Taylor Farms Pac., Inc., 305 F.R.D. 197, 213 (E.D. Cal. 2015) (citing Rannis v. Recchia, 380 F. App'x 646, 651 (9th Cir. 2010)); Collins v. Cargill Meat Sols. Corp., 274 F.R.D. 294, 300 (E.D. Cal.

---

[5] The Court ruled that it will set the class certification end period to August 29, 2022, as agreed to by Plaintiff, if class certification is granted in this case. See Doc. No. 52 at 7.

2011).  Based on Walter's representations, the proposed class includes at least 300 individuals.
This satisfies the numerosity requirement of Rule 23(a)(1).  See Gomez, 334 F.R.D. at 251
(explaining that an exact number of class members is not required for certification if it is
reasonable to believe that joinder would be impracticable); Collins, 274 F.R.D. at 300.

Leprino contends that the proposed class is not sufficiently numerous because Plaintiff
failed to identify any putative class members that experienced an on-duty meal period or a late
meal period due to the policies and practices alleged.  The Court disagrees.  Walter presented
evidence that some of the hourly employees' meal breaks were untimely or short, see Doc. No. 32-
1 at 20-21; Doc. No. 32-6 at 11, 15-16; Doc. No. 57 at 42-47, and that class members were
required to attend to their duties and the production line during meal and rest periods.  See Doc.
Nos. 32-1 at 21-26; Doc. No. 57 at 51-63.  Accordingly, the Court finds the numerosity
requirement satisfied.

### C.   Commonality

Pursuant to Rule 23(a)(2), a class action is maintainable only if "there are questions of law
or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To meet the commonality requirement,
class claims must be based on a "common contention . . . capable of classwide resolution."  Wal-
Mart Stores, 564 U.S. at 350.  This means that determination of the "truth or falsity" of that
contention "will resolve an issue that is central to the validity of each one of the claims in one
stroke."  Id.  Certification does not turn on "the raising of common 'questions'—even in droves—
but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the
resolution of the litigation."  Id. (quoted source omitted).  In other words, not "every question of
law or fact must be common to the class; all that Rule 23(a)(2) requires is 'a single significant
question of law or fact.'"  Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir.2013)
(emphasis omitted) (quoting Mazza v. Am. Honda Motor Co., 666 F.3d 581, 589 (9th Cir. 2012)).

The commonality requirement has similarities with and serves as the foundation to the
commonality-predominance requirement of Rule 23(b)(3).  See Newberg on Class Actions § 3:27
(explaining that Rule 23(b)(3)'s commonality-predominance requirement "obviously builds on"
Rule 23(a)(2)'s commonality requirement).  Because of the overlap between these two

1  requirements, the Court will analyze Rule 23(a)(2)'s commonality requirement below when the

2  Court analyzes Rule 23(b)(3)'s commonality-predominance requirement.  See Gomez, 334 F.R.D.

3  at 251.

### D.    Typicality

5       Pursuant to Rule 23(a)(3), a class action may be maintained only if the "claims or defenses

6  of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P.

7  23(a)(3).  "[T]ypicality determines whether a sufficient relationship exists between the injury to

8  the named plaintiff and the conduct affecting the class so that the court may properly attribute a

9  collective nature to the challenged conduct."  Newberg on Class Actions § 3:29. The test for

10 typicality is (1) "whether other members have the same or similar injury," (2) "whether the action

11 is based on conduct which is not unique to the named plaintiffs," and (3) "whether other class

12 members have been injured by the same conduct."  Wolin v. Jaguar Land Rover N. Am., LLC,

13 617 F.3d 1168, 1175 (9th Cir. 2010) (citations omitted).

14      Walter has alleged and produced evidence showing that he and other putative class

15 members suffered the same or similar injuries.  For example, Walter presented evidence that his

16 and other class members' meal breaks were not timely, that they were subjected to Leprino's same

17 rounding policies, and that they were required to attend to the production line and other duties

18 during meal and rest break periods.  Moreover, Walter has alleged and produced evidence showing

19 that he and other putative class members were injured by Leprino's same conduct—i.e., the

20 alleged on-call breaks, Leprino's time punch rounding policies, pre- and post-shift duties, and

21 alleged failures to provide premium pay and additional breaks.  Walter has not made claims based

22 on conduct that is unique to him, but instead raises claims based on Leprino's policies and

23 practices as they apply to the putative class.  Thus, Walter's allegations and proffered evidence

24 satisfy the typicality requirement.

### E.    Adequacy of Representation

26      Pursuant to Rule 23(a)(4), a class action is maintainable only if the "the representative

27 parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The

28 term "parties" refers to both the class representative and class counsel.  In re Conseco Life Ins. Co.

LifeTrend Ins. Sales & Mktg. Litig., 270 F.R.D. 521, 531 (N.D. Cal. 2010).  The Ninth Circuit tests the adequacy as follows: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Ellis v. Costco Wholesale Corp., 657 F.3d 970, 985 (9th Cir. 2011) (quoted source omitted).  "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees."  Id.  The standard for adequacy splits into two prongs: adequacy of the proposed class representative and adequacy of the attorneys seeking appointment as class counsel.  Newberg on Class Actions § 3:54.

### 1. Adequacy of Class Representative

The Court finds that Walter is an adequate class representative.  First, despite Leprino's contentions to the contrary, Walter is not conflicted.  Walter declares that he does not have any conflicts with any of the other employees at Leprino and that he never intends to.  Doc. No. 40-3 at 2, ¶ 2.  His stated interest is to help the other employees correct the alleged legal wrongs that Leprino committed.  Id.  Walter further declares that he will always put the best interests of the other employees first while performing his duties as a potential leader in this case, id. at 2, ¶ 3, and that he will work with his attorneys to help achieve the best result possible for the class.  Id. at 4, ¶ 8.  Plaintiff's primary interests also do not conflict with the interests of the supervisors and foremen who are putative members of the class.  Simply because they implemented Leprino's allegedly unlawful policies does not mean that Plaintiff has assigned partial responsibility for wage and hour violations to them.  There is no indication that Plaintiff is placing legal blame on the supervisors and foremen.  Cf. Hughes v. WinCo Foods, 2012 WL 34483, at *7 (C.D. Cal. Jan. 4, 2012) (finding an adequacy conflict where the class representatives "assign[ed] partial responsibility for labor law violations" to members of the proposed class).  This is not surprising because there is no indication that the supervisors and foremen were responsible for creating Leprino's facility-wide policies.  Walter is advancing claims that attack Leprino's facility-wide policies, and those policies allegedly violated the supervisors and foremen's' employment rights in the same way that they affected the rights of Walter and the rest of the class.  Thus, it is not

1   evident to the Court that they are conflicted with the supervisors and foremen.  See Pena v. Taylor

2   Farms Pac., Inc., 305 F.R.D. 197, 215 (E.D. Cal. 2015) (finding no adequacy-conflict where the

3   employer's policies universally affected all members of the class, including supervisors who

4   implemented the policies but were also putative members of the class). See also J.D. v. Azar, 925

5   F.3d 1291, 1317 (D.C. Cir. 2019) ("[C]ourts have been reluctant to find the class representatives

6   inadequate even if some class members have an explicit desire to maintain the status quo.")

7   (citations omitted); Ruggles v. WellPoint, Inc., 272 F.R.D. 320, 338 (N.D.N.Y. 2011) (holding

8   that representatives were adequate in wage-and-hour lawsuit although some of the employee class

9   members did not share the goals of the litigation, particularly because "[a]dequacy is not

10  undermined where the opposed class members' position requires continuation of an allegedly

11  unlawful practice.").

12      Furthermore, Walter has performed several tasks in his potential role as class leader.  He

13  met with counsel to discuss the facts of the case, reviewed documents, maintained

14  communications with counsel regarding the status of the lawsuit, provided counsel with any

15  information or documents they requested, and provided several hours of deposition testimony

16  regarding his experience at Leprino.  Doc. No. 40-3 at 3, ¶ 5.  He also offered himself for another

17  deposition by Defendants to discuss his role as putative class representative.  Although Walter has

18  not prosecuted this case from its inception, he possesses sufficient knowledge of the case to meet

19  the adequacy standard.  See Newberg on Class Actions § 3:67 (5th ed.) ("[C]ourts have similarly

20  held that while a plaintiff must have some knowledge of the litigation and facts of the case, a class

21  representative need only possess a minimal degree of knowledge necessary to meet the adequacy

22  standard.") (quoting New Directions Treatment Services v. City of Reading, 490 F.3d 293, 313

23  (3d Cir. 2007) and citing other federal circuit cases).  Thus, Walter satisfies the adequacy of

24  representation requirement.

25          2.  Adequacy of Class Counsel

26      The Court finds that Walter's counsel are adequate representatives.  The Parris Law Firm

27  has certified numerous wage-and-hour class actions and has trial experience in the state of

28  California.  Doc. No. 32-5 at 2, ¶¶ 3–5.  This Court has also recognized The Parris Law Firm as

adequate representatives in other wage-and-hour class action lawsuits against Leprino.  See Perez v. Leprino Foods Co., 2021 U.S. Dist. LEXIS 2165, *43 (E.D. Cal. Jan. 6, 2021); Vasquez v. Leprino Foods Co., 2020 U.S. Dist. LEXIS 56425, *35 (E.D. Cal. Mar. 30, 2020).  The Court also finds that The Parris Law Firm appears to be willing and able to commit sufficient resources to representing the proposed class.  Accordingly, the adequacy of class counsel is satisfied in this case.

### F.   Commonality-Predominance

The commonality and predominance requirement of Rule 23(b)(3) asks whether the class members' interests are "sufficiently cohesive to warrant adjudication by representation."  Amchem Prods. v. Windsor, 521 U.S. 591, 623 (1997).  The inquiry "logically entails two steps": first, whether the issues in the case are individual or common; and, second, whether the common issues predominate over the individual issues.  Newberg on Class Actions § 4:50.

As for the first step, an individual issue is one where "the members of a proposed class will need to present evidence that varies from member to member."  Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016) (citing Newberg on Class Actions § 4:50).  By contrast, a common issue is one either where "the same evidence will suffice for each member to make a prima facie showing," id., or, similarly, where the issue is "susceptible to generalized, class-wide proof."  In re Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006).

As for the second step, common issues likely will not predominate if "a great deal of individualized proof" would need to be introduced to address most or all of the elements of a claim, Gomez, 334 F.R.D. at 256 (citing Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004)), or "a number of individualized legal points" would need to be established after common questions were resolved, id. (citing Klay, 382 F.3d at 1255), or "the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues."  Id. (quoting Cooper v. Southern Co., 390 F.3d 695, 722 (11th Cir. 2004)).  By contrast, common questions likely will predominate if "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria — thus rendering unnecessary an evidentiary hearing on each claim," id. (citing Smilow v. Southwestern Bell

12

Mobile Systems, Inc., 323 F.3d 32, 40 (1st Cir. 2003)), or "when adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced." Id. (citing Newberg on Class Actions § 4:50). A finding of predominance will generally not be defeated merely because there is a need to make individualized damage determinations. See Just Film, Inc. v. Buono, 847 F.3d 1108, 1121 (9th Cir. 2017); Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013).

Here, Walter presents four sets of common questions—one set concerning his pre-shift rounding claim, one set concerning his untimely meal break claim, one set concerning his on-call break claims, and one set concerning his on-duty meal period claim. The Court will undertake the commonality-predominance inquiry by analyzing Walter's claims, and his theories of liability for each, in turn. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) ("Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action."); Jimenez v. Allstate Ins. Co., 765 F.3d 1161, 1165–66 (9th Cir. 2014) ("Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised.").

### 1. Pre-shift Rounding Claim

Walter argues that Leprino's time punch rounding and attendance policies were common across the putative class, and that over a period of time they improperly shaved off time that employees spent working before the start of their shifts. In response, Leprino argues that these policies did not improperly round out compensable time because the employees were not required to work and were not under Leprino's control during the time leading up to the start of their shifts.

Under California law, an employer is permitted to adopt a rounding policy so long as it is "fair and neutral on its face and 'it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.'" See's Candy Shops, Inc. v. Superior Court, 210 Cal. App. 4th 889, 907 (2012) (quoting 29 C.F.R. § 785.48); see also Sali, 909 F.3d at 1009; Corbin v. Time Warner Entm't-Advance/Newhouse P'ship, 821 F.3d 1069, 1076 (9th Cir. 2016). California's compensable-time standard encompasses two categories of time: First, time is compensable if an employee is "under the

control" of his or her employer, whether or not he or she is engaging in work activities, such as by being required to remain on the employer's premises or being restricted from engaging in certain personal activities. Sali, 909 F.3d at 1010 (citing Morillion v. Royal Packaging Co., 22 Cal. 4th 575 (Cal. 2000) and Aguilar v. Assn. of Retarded Citizens, 234 Cal. App. 3d 21 (Ct. App. 1991)); see also Frlekin v. Apple Inc., 8 Cal. 5th 1038, 1046 (2020). Second, time is compensable if an employee "is suffered or permitted to work, whether or not required to do so." Sali, 909 F.3d at 1010 (citing Morillion, 995 P.2d at 578). This may include "time an employee is working but is not subject to an employer's control," such as "unauthorized overtime, which the employer has not requested or required." Id. (citing Morillion, 995 P.2d at 584-85); see also Frlekin, 8 Cal. 5th at 1046.

Here, Walter does not argue that Leprino's rounding policy alone was unfair or not neutral on its face. Rather, Walter argues that when the rounding policy was implemented alongside Leprino's attendance and pre-shift policies, it rounded the employees' compensable time against the employees and never for them. According to Walter, the employees' compensable time included the up-to-seven minutes of time spent clocked in before the start of their shifts and the time they spent working before they clocked in. Walter asserts that during both of these times the employees were restricted from pursuing their own purposes because they had to comply with Leprino's pre-shift requirements—such as donning their uniforms, completing sanitation procedures, and traveling to pre-shift meeting areas—which collectively took at least fourteen minutes to complete. Doc. No. 32-1 at 31-32; Doc. No. 57 at 27-29.

Leprino does not deny that hourly employees regularly clocked in up to seven minutes before—and not after—the start of their shifts, and that Leprino regularly rounded out these up-to-seven minutes of time for payroll purposes. However, Leprino denies that these up-to-seven minutes of time were compensable under California law in the first instance. Leprino also denies Walter's contention that the time employees spent allegedly working before they clocked in was compensable. According to Leprino, the employees were not required to work nor under Leprino's control during the time leading up to the start of their shifts.

With respect to Walter's allegations that the putative class acquired compensable time

before clocking in, the Court is not convinced that Walter's proposed common questions would predominate over individualized inquiries.  Leprino's corporate policy expressly prohibited non-exempt employees from working "while not on the clock."  Doc. No. 56 at 18 (citing Doc. No. 33-1 at 189, 225, and 262).  Additionally, Leprino's corporate policy provided that "[n]on-exempt employees who are required to wear uniforms must change into and out of their uniform *while on the clock* – this means that you will clock in prior to putting on your uniform at the beginning of your shift and will not clock out at the end of your workday until you have changed out of your uniform."  Id. at 19 (citing Doc. No. 33-1 at 190, 226, and 263) (emphasis added).  Although Walter presents evidence that some employees arrived at the facility "usually about twenty to thirty minutes before their start times," Doc. No. 32-1 at 17, and "put on their uniforms before clocking-in," id. at 20 n.10, this evidence does not show that Leprino's rounding, time punch, and attendance policies are common evidence that "will suffice for each member to make a prima facie showing."  Tyson Foods, 577 U.S. at 453.  Rather, the evidence shows that the experiences of employees before they clocked in for their shifts "varie[d] from member to member."  Id.  For example, several employees, including Plaintiff's witness, stated that when they arrived early to the facility before their shifts, they simply waited in their cars or the break room until they could clock in.  See Doc. No. 56-1 at 144-55 (Anaya Dep. 94:12-95:13, 97:6-20, 117:9-18), 329 (Chhann Dep. 152:4-9), and 199-200 (Guaydacan Dep. 102:6-13, 103:10-21); see also Doc. No. 56-2 at 19 (Hurst Dec. ¶ 3) and 83 (Yates Dec. ¶ 4).  Additionally, many employees, including Plaintiff's witnesses, stated that they clocked in before they changed into their uniforms and completed sanitation procedures.  See Doc. No. 56-1 at 200-201 (Guaydacan Dep. 103:19-104:8), 154 (Anaya Dep. 116:14-19), 265 (Rosales Dep. 171:13-18), 46 (French Dep. 117:5-8), and 305 (DeWalt Dep. 208:10-15); see also Doc. No. 56-2 at 13-14 (Gutierrez Dec. ¶¶ 3, 4), 54 (Renteria Dec. ¶¶ 6-7), 83 (Yates Dec. ¶ 4), 8-9 (Alvarez Dec. ¶ 5), 63 (Travers Dec. ¶ 4).  Several employees also stated that they were aware of Leprino's policy to change into uniforms while on the clock but chose to arrive early and change into their uniforms anyways before clocking in.  See Doc. No. 56-1 at 147 (Anaya Dep. 97:6-20); see also Doc. No. 56-2 at 19 (Hurst Dec. ¶ 3) and 83 (Yates ¶ 4).  Furthermore, several employees, including Plaintiff's witnesses, stated that they were

never asked to perform any work off the clock.  See Doc. No. 56-1 at 109 (Allan Dep. 77:10-13), 211 (Guaydacan Dep. 149:11-13, 149:23-150:1), 277 (Rosales Dep. 196:16-25), 54 (French Dep. 143:5-14), 334 (Chhann Dep. 167:7-22), 156 (Anaya Dep. 118:11-14), and 85 (Smith Dep. 206:12-16).  In light of this evidence, the Court finds that the question of whether employees were working or under Leprino's control before they clocked in is not subject to common proof that would predominate over individualized inquiries.

Furthermore, with respect to the issue of whether putative class members acquired compensable time from the time they spent clocked in up to seven minutes before the start of their shifts, the Court also finds that common questions do not predominate over individualized inquiries.  Although Leprino acknowledges that employees regularly clocked in up to seven minutes before the start of their shifts, Leprino did not expressly require them to do so; Leprino simply required them to be clocked in at the start of their shifts.  Doc. No. 56-2 at 44; Doc. No. 32-2 at 380-81.  Additionally, Plaintiff has not provided sufficient common evidence indicating a reason why all putative class members had to begin their pre-shift requirements before the start of their shifts.  Leprino expected employees with pre-shift meetings to be in uniform, with whatever personal protective equipment they were required to wear, when they arrived at their pre-shift meetings by 10 minutes after their scheduled start time.[6]  Doc. No. 56-2 at 36 (McDaniel Dec. ¶ 21); see also Doc. No. 56 at 40-41.  While Walter argues that pre-shift requirements took more than 10 minutes to complete, he has not sufficiently shown that this was common or required for all putative class members.  Some hourly employees did not have to wear uniforms, and if they did, the type of uniform and personal protective equipment they were required to wear were not all the same.  Doc. No. 56-2 at 25 and 73-74.  Additionally, some employees did not have pre-shift meetings until well beyond ten minutes after the start of their shifts, id. at 63-64 and 78, and some did not have pre-shift meetings at all, meaning they did not have to complete the pre-shift

---

[6] Walter argues that pre-shift meetings began at the start time of shifts, citing as authority a series of statements by individual employees.  Doc. No. 32-1 at 14 n.3.  However, at least two of these individuals stated during their depositions that pre-shift meetings began ten minutes after the start of shifts.  See Doc. No. 56 at 41; see also Doc. No 56-1 at 544 (Austin Dep. 183:7-11) and 148 (Anaya Dep. 98:1-5).  Additionally, Leprino provided a lengthy series of statements by individual employees that pre-shift meetings began ten minutes after their scheduled shift start times.  Doc. No. 56 at 20.  Walter did not meaningfully address these statements in his Reply brief.

1    requirements to attend these meetings.  Id. at 25 and 73-74; Doc. No. 56-1 at 102.

2           For the portion of the putative class that had to don uniforms and attend pre-shift meetings

3    ten minutes after the start of their shifts, the evidence shows that the time estimates to complete

4    these pre-shift duties varied significantly by individual.  Walter provides testimony from

5    individuals stating that their pre-shift requirements collectively took at least fourteen-to-fifteen

6    minutes to complete.[7]  Doc. No. 32-1 at 17-19.  However, some of the time estimates of Plaintiff's

7    own witnesses indicate that less time was needed to complete pre-shift tasks.  For example, despite

8    Walter's contention that the process of changing into uniform took "up to an additional fifteen

9    minutes to complete," Walter's briefing acknowledges that it took David Anaya approximately

10   seven minutes and Michael Dewalt approximately five minutes.  Doc. No. 32-1 at 18 n.8.

11   Additionally, despite Walter's contention that the sanitation process "takes approximately five

12   minutes," Walter's briefing acknowledges that it took David Anaya and Tony Rosales

13   approximately two-to-three minutes.  Id. at 19 n.9.  Furthermore, Leprino submitted testimony

14   from employees stating that their pre-shift requirements took much less than what Walter

15   suggests.  Doc. No. 56 at 20.  For example, Lisethe Gutierrez and Roberto Renteria testified that

16   the entire process of grabbing a uniform, putting it on, going through the redline room, and getting

17   to the pre-shift meeting took approximately ten minutes or less.  Doc. No. 56-2 at 13-14, 54.

18          It is also unclear whether all putative class members were under Leprino's control or

19   actually working during the up-to-seven minutes of time they spent clocked in before the start of

20   their shifts.  Walter does not argue or present evidence that Leprino prohibited these individuals

21   during the seven-minute window from clocking out, leaving the premises, and clocking back in by

22   the start of their shifts.  Additionally, evidence shows that several employees clocked in and spent

23   the time up until the start of their shifts as they pleased, such as by chatting with others, heating up

24   their breakfast, getting coffee, going to the restroom, or simply waiting for their pre-shift meetings

25   to commence.  Doc. No. 56-2 at 25; Doc. No. 56-1 at 146-48.  For example, Plaintiff's own

26   witness David Anaya stated he was ready and present at his pre-shift meeting "two or three

27

28   [7] Walter also cites portions of the collective bargaining agreements to show that pre-shift duties took at least fourteen minutes to complete.  Doc. No. 32-1 at 19.  However, these time estimates were not made in the context of pre-shift duties.  Additionally, the time estimates include time for doffing uniforms, which is not a pre-shift duty.

minutes before 7:00 o'clock" and waited until the meeting began at 7:10 a.m.  Doc. No. 56-1 at

146-48.  According to Anaya, Leprino provided employees "ten minutes to get to their meeting,"

but he chose to not use that time and instead used his own time to arrive at the 7:10 a.m. meeting a

few minutes before his shift even started.  Id. at 146 ("Me, I am in my [pre-shift meeting] at two or

three minutes before 7:00 o'clock.  But I don't use the other people's [ten minutes of] time. I use

my time.  And I just go with my time.").

The evidence and statements above evince individual actions by putative class members,

and indicate that the Court would need to make individualized inquiries to determine whether the

putative class acquired compensable time from the time they spent clocked in up to seven minutes

before the start of their shifts.  See Meek v. SkyWest, Inc., 562 F. Supp. 3d 488, 497 (N.D. Cal.

2021) (finding insufficient commonality where the court would have to determine if each class

member actually worked or was under the employer's control during the rounded period); Wilson

v. Pactiv LLC, 2021 U.S. Dist. LEXIS 234111, *19 (C.D. Cal. Dec. 3, 2021) (same).  Although

some common questions exist regarding whether Leprino's rounding, time punch, and attendance

policies resulted in a failure to compensate employees for all the time they actually worked, they

do not predominate over the individualized inquiries discussed above.

    2.  Untimely and Short Meal Break Claim

"Under California law, employers must generally provide employees with one 30-minute

meal period that begins no later than the end of the fifth hour of work[.]"  Donohue v. AMN

Servs., LLC, 11 Cal. 5th 58, 61 (2021) (citing Lab. Code § 512(a)).  If an employer does not

provide an employee with a compliant meal period, then "the employer shall pay the employee

one additional hour of pay at the employee's regular rate of compensation for each workday that

the meal … period is not provided."  Id. (citing Lab. Code, § 226.7(c)).  The meal periods must be

full and timely whenever they are required, and even a minor infringement of the meal period

triggers the premium pay obligation.  Id. at 68.  Accordingly, "employers cannot engage in the

practice of rounding time punches—that is, adjusting the hours that an employee has actually

worked to the nearest preset time increment—in the meal period context."  Id. at 61.  "The practice

of rounding time punches for meal periods is inconsistent with the purpose of the Labor Code

provisions and the IWC wage order." Id. at 68.

"If time records show noncompliant meal periods, then a rebuttable presumption of liability arises." Id. at 78; see also Estrada v. Royalty Carpet Mills, Inc., 76 Cal. App. 5th 685, 723 (2022) (applying Donohue's "rebuttable presumption" standard in class certification context); Santillan v. Verizon Connect, Inc., 2022 U.S. Dist. LEXIS 182405, *38 (S.D. Cal. June 13, 2022) ("Donohue's rebuttable assumption does play an important role in this Court's consideration of class-certification under Rule 23."). The employer then "may rebut the presumption" with evidence of proper compensation or that the employees had in fact been provided compliant meal periods during which they chose to work. Donohue, 11 Cal. 5th at 77-78; Estrada, 76 Cal. App. 5th at 726 (employer may rebut presumption in class certification context by showing that "a significant number of employees voluntarily chose to skip their meal breaks, creating individualized issues of liability"); Santillan, 2022 U.S. Dist. LEXIS 182405, at *38.

Here, Walter argues that the following is a common question that will drive the resolution of the litigation: whether Leprino's meal period timekeeping system resulted in untimely or short meal periods for the putative class members in violation of California law. In support of this argument, Walter provides evidence of Leprino's time punch rounding policies, putative class member testimony, and data findings of Dr. Brian Kriegler. In response, Leprino argues that Walter's commonality argument fails because he has not submitted sufficient evidence showing that Leprino systematically provided the putative class members with meal periods after their fifth hour of work from the start of their shifts. Additionally, Leprino asserts that the putative class member testimony submitted by Plaintiff concerning late meal breaks has nothing to do with Leprino's rounding policy. Leprino also argues that Kriegler's methodology is flawed because it assumes any time rounded against an employee was uncompensated.

Although the Court agrees with Leprino that the untimely meal break testimony of Plaintiff's witnesses is unpersuasive,[8] the data findings of Kriegler create a rebuttable presumption

---

[8] The testimony of Michael DeWalt and Pearla Baeza indicate that they were sometimes unable to take a meal break because of issues that occurred during their shift, not because of Leprino's rounding policy. Doc. No. 32-4 at 17; Doc. No. 32-2 at 511. Additionally, the testimony of Ricardo Guaydacan indicates that sometimes his meal break was late not because of the rounding policy but because of a lack of break relief. Doc. No. 32-2 at 472. The cited testimony of James Yates does not concern meal breaks at all. Doc. No. 32-2 at 656-57.

of Leprino' liability for improperly rounding meal period time punches.  In *Donohue*, the employer's time records showed 40,110 short meal periods and 6,651 delayed meal periods that did not show up as short or delayed in the employer's timekeeping system because of rounding. Donohue, 11 Cal. 5th at 79.  The *Donohue* Court stated that the introduction of these time records would trigger the rebuttable presumption that the employer improperly used rounded time punches to track potentially noncompliant meal periods.  Id.  As in *Donohue*, Kriegler presented his findings after analyzing time records of a sample set of approximately 94 putative class members between December 1, 2016 and February 8, 2021.  Doc. No. 32-6 at 7-8.  Kriegler's findings indicate that there were a total of 630 short first meal periods with a duration of exactly 30 minutes if based on inferred rounded punches and a total of 1,297 late first meal periods that started exactly five hours after the shift began if based on inferred rounded punches.  Id. at 15.  The introduction of these findings is sufficient to trigger the rebuttable presumption and shift the burden onto Leprino to show that a significant number of employees either received proper compensation or voluntarily chose to skip their meal breaks, creating individualized issues of liability.  Estrada, 76 Cal. App. 5th at 726; Santillan, 2022 U.S. Dist. LEXIS 182405, at *38 (citing Donohue, 481 P.3d at 674).

Although Leprino argues that Kriegler's findings improperly assume that employees were uncompensated, Leprino does not present any meaningful evidence showing otherwise.  Leprino submits declarations and testimony of putative class members stating they had break relief to provide them with timely breaks, that they always took their meal break before their fifth hour of work, and that they do not recall ever clocking out late for their meal breaks.  Doc. No. 56 at 38. Leprino also presents evidence that it insisted that employees take their meal periods by the fifth hour and counseled or disciplined them when they did not do so.  Id. at 38-39.  Although these declarations and testimonies evince evidence of compliant meal periods, they are not evidence that the employees received proper compensation for untimely meal breaks or that they voluntarily chose to miss some or all of their meal periods.  Santillan, 2022 U.S. Dist. LEXIS 182405, at *39.

Leprino also argues that Plaintiff failed to offer any evidence that Leprino systematically failed to pay penalty pay.  Doc. No. 56 at 39.  However, as discussed above, because Plaintiff

1   triggered the rebuttable presumption of class wide liability, the burden shifted to Leprino to show

2   that a significant number of employees either received proper compensation or voluntarily chose

3   to skip their meal breaks, creating individualized issues of liability.  Estrada, 76 Cal. App. 5th at

4   726; Santillan, 2022 U.S. Dist. LEXIS 182405, at *38 (citing Donohue, 481 P.3d at 674).  Based

5   on Leprino's submitted evidence and briefing, the Court is unable to find that Leprino rebutted the

6   presumption or that individualized issues of liability predominate over the common question of

7   whether Leprino's meal period timekeeping system resulted in untimely or short meal periods for

8   the putative class in violation of California law.

9                   3.   On-Call Break Claim

10          Under California law, "employees must not only be relieved of work duties [during

11  breaks], but also be freed from employer control over how they spend their time."  Augustus v.

12  ABM Sec. Servs., Inc., 2 Cal. 5th 257, 270 (2016); see also Brinker Rest. Corp. v. Superior Court,

13  53 Cal. 4th 1004, 1038-39 (2012) (stating that the "fundamental employer obligations associated

14  with a meal break" are "to relieve the employee of all duty and relinquish any employer control

15  over the employee and how he or she spends the time").  In Augustus, the California Supreme

16  Court explained that if employees are effectively "on call" during meal or rest periods because

17  conditions require them to be ready and capable of being summoned to action, then the breaks

18  provided are not control-free and, consequently, not legally compliant.  Augustus, 2 Cal. 5th at

19  270.  Employers who fail to provide duty free meal or rest breaks must pay the employee "one

20  additional hour of pay at the employee's regular rate of compensation for each workday that the

21  meal or rest period [was] not provided."  Cal. Lab. Code § 226.7.

22          Walter claims that the following evidence collectively demonstrate that Leprino's hourly

23  employees were "on-call" during their meal and rest breaks: (1) Leprino's policies stressed

24  "quality" and makes "quality" the class members' responsibility, effectively requiring them to

25  attend to the production line even during breaks; (2) Leprino's policy regarding responsiveness to

26  supervisors required employees to remain alert and responsive to supervisors' questions and

27  instructions during breaks; (3) many workers were assigned radios and told to carry them at all

28  times, including during breaks; (4) Leprino installed an intercom in the breakroom so workers

could communicate with the floor during breaks; (5) testimony of putative class members confirm that Leprino's policies and practices have created a culture of on-call breaks; and (6) this Court certified two class actions alleging a similar on-call theory against the same Defendant.  Doc. No. 32-1 at 36; see Perez, 2021 U.S. Dist. LEXIS 2165, at *34; Vasquez, 2020 U.S. Dist. LEXIS 56425, at *51.  Walter asserts that the above evidence pose a common question that is central to his claim:  namely, in light of Leprino's uniform policies and practices, are the class members actually on call during breaks?  Said differently, are the class members not truly freed from Leprino's control during their breaks?  Vasquez, 2020 U.S. Dist. LEXIS 56425 at *43.

Walter has presented sufficient evidence to satisfy the commonality requirement for his on-call break claims.  Walter, through several witness declarations and depositions from putative class members, has shown that the putative class was subjected to Leprino's foregoing policies and practices.  Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1029 (9th Cir. 2012) ("[C]ommonality requires the plaintiff to demonstrate the class members 'have suffered the same injury.'"); Staton v. Boeing Co., 327 F.3d 938, 954 (9th Cir. 2003) ("[T]he breadth and consistency of class counsel's initial evidence places the district court's finding of commonality well within that court's discretion.").  For example, many putative class members stated that they and other employees were regularly contacted during their breaks about work-related matters, be it via radio, intercom, or in person.  Doc. No. 32-1 at 23 n.13 (citing Allan Depo. at 68:11–69:11; Anaya Depo. at 69:7–18, 149:10–150:25; Chhann Depo. at 72:18–25, 74:3–25, 88:16–92:23, 108:4–111:3; DeWalt Depo. at 41:25–42:8, 204:4–205:7; Gutierrez Depo. at 97:20–98:21, 195:7–196:1; Hurst Depo. at 87:16–22, 92:4–8, 146:13–147:6, 149:17–21, 150:8–151:9, 154:18–155:16; Rosales Depo. at 125:21–126:3; Sun Depo. at 130:23–131:5, 132:20–133:4; Smith Depo. at 94:1–21, 97:25–98:18, 188:18–189:16; Travers Depo. at 85:11–87:15, 89:5–90:9).  Additionally, many putative class members stated they were required to attend to their duties and the production line, even during meals and rest periods.  Doc. No. 32-1 at 23 n.12 (citing Anaya Depo. at 59:18–60:23, 65:1–66:5; DeWalt Depo. at 204:4–205:21; Chhann Depo. at 96:6–25; Guaydacan Depo. at 71:5–14; Hurst Depo. at 145:7–146:12; Travers Depo. at 86:21–87:18; Rosales Depo. at 117:5–14; Withers Depo. at 34:22–35:12; Yates Depo. at. 159:23– 160:1); see also Doc. No. 32-4 at 8

1  (Anaya Decl. at ¶ 6), 4 (Allan Decl. at ¶ 4), 26-27 (DeWalt Decl. at ¶¶ 4, 7), 21 (Chhann Decl. at ¶

2  5), 39 (Guaydacan Decl. at ¶ 4), 58-59 (Smith Decl. at ¶ 5), and 55 (Rosales Decl. at ¶ 5).

3          In light of this evidence, there exists a common question as to whether Leprino's uniform

4  policies and practices compelled employees to remain on-call during their meal and rest periods.

5  See Howell v. Leprino Foods Co., 2022 U.S. Dist. LEXIS 52796, *28-29 (E.D. Cal. Mar. 22,

6  2022).  This common question is central to Walter's claim and one that can be answered with

7  common proof regarding common injury.  If at trial the jury answers yes, then Leprino is liable to

8  the class for meal and rest period violations; if the answer is no, then Leprino is not liable.  Id. at

9  *29.  This satisfies the commonality requirement under Rule 23(a)(2).  Id.; Perez, 2021 U.S. Dist.

10 LEXIS 2165 at *31 (finding there exists a common question as to whether Leprino's uniform

11 policies and practices compel employees to remain on-call during their meal and rest periods);

12 Vasquez, 2020 U.S. Dist. LEXIS 56425 at *43-*45 (same); see also Wright v. Renzenberger, Inc.,

13 2017 U.S. Dist. LEXIS 225209, *19 (C.D. Cal. Sep. 30, 2017) (finding common question as to

14 whether drivers were on-call during rest periods based on uniform policy); Ayala v. U.S. Xpress

15 Enters., 2017 U.S. Dist. LEXIS 125247, *29 (C.D. Cal. July 27, 2017) ("[L]iability will turn on

16 whether 'securing the load' and responding to alerts messages rises to the level of employee

17 control that would turn any break periods provided into impermissible on call breaks, that would

18 consequently require compensation.").

19         Leprino's arguments against commonality are not persuasive.  First, Leprino argues it does

20 not have an express on-call break policy in writing.  However, Walter does not dispute this point;

21 Walter's on-call break claim is premised on the assertion that Leprino's policies on quality,

22 production goals, responsiveness to supervisors, and use of communication devices have the effect

23 of putting putative class members on call during their breaks.  Therefore, the lack of an express

24 on-call break policy does not defeat Walter's on-call break claims.

25         Second, Leprino contends it does not have a de facto on-call break policy because (1)

26 Leprino's emphasis on quality does not require employees to watch production during breaks, (2)

27 Leprino does not require hourly employees to respond to supervisors during breaks, (3) not all

28 hourly employees carry radios, and the few who do are not required to keep them on and respond

during breaks, and (4) employees were not required to listen and respond to calls over the facility's intercom during their breaks.  While the Court appreciates Leprino's challenges to each facet of Plaintiff's multifaceted theory, Plaintiff has sufficiently shown that the above policies are common and that a reasonable judgment could be formed based on this evidence that they collectively put the putative class on call during their breaks.  See Sali, 909 F.3d at 1005; see also Perez, 2021 U.S. Dist. LEXIS 2165 at *31; Vasquez, 2020 U.S. Dist. LEXIS 56425 at *43-*45.  Plaintiff has shown, for example, that "quality" was one of Leprino's core values at the Tracy facility during the putative class period, and that "every employee [was] responsible to make sure [Leprino] produced a quality product."  Doc. No. 32-1 at 22 (citing McDaniel Depo. at 72:7–18).  In accordance with this emphasis on quality, Plaintiff submitted evidence that putative class members during their breaks were told to remain on standby or called back to attend to the production line and address issues impacting product quality.  Doc. No. 32-2 at 550-53 (Chhann Depo. 108:4–111:3), 446-47 (Anaya Depo. 67:8–68:18), and 507-08 (DeWalt Depo. at 41:25– 42:8); Doc. No. 57-1 at 233-34 (Rosales Depo. 130:23–131:16).  Plaintiff has also shown that Leprino regarded insubordination to supervisors as a cause for discipline, and that supervisors contacted many putative class members during breaks regarding work-related inquiries or instructions on multiple occasions.  Doc. No. 32-1 at 23 n.13 (citing Allan Depo. at 68:11–69:11; Anaya Depo. at 69:7–18, 149:10–150:25; Chhann Depo. at 72:18–25, 74:3–25, 88:16–92:23, 108:4–111:3; DeWalt Depo. at 204:4–205:7; Gutierrez Depo. at 195:7–196:1; Rosales Depo. at 125:21–126:3; Sun Depo. at 130:23–131:5, 132:20–133:4).  Furthermore, Plaintiff has shown that while not every employee carried a radio or was called over a communications device during breaks, evidence of that practice "may be reasonably considered by the factfinder as reflective or symbiotic of a facility-wide policy that prioritizes work above breaks."  Vasquez, 2020 U.S. Dist. LEXIS 56425, at *47; see also Howell, 2022 U.S. Dist. LEXIS 52796, at *31-*32.

Finally, Leprino argues that Walter has not presented sufficient evidence that putative class members were subject to Leprino's "control" during their breaks.  Leprino specifically asserts that the element of control cannot be determined through analysis of Leprino's policies and practices alone and that putative class members disagree about the level of control Leprino had over them

during breaks.  However, as discussed above, Plaintiff has presented evidence showing that Leprino's policies and practices regarding quality, responsiveness, and communication were common to the putative class and implemented against putative class members even during their breaks.  Additionally, *Augustus* distinguished the authority Leprino primarily cites in support of its control argument, <u>Madera Police Officers Ass'n v. City of Madera</u>, 36 Cal. 3d 403 (1984), on the ground that *Madera* concerned on-call 24-hour shifts which are inapposite in the context of rest and meal break periods.  <u>Augustus</u>, 2 Cal. 5th at 271 n.13.  Therefore, Leprino's control argument is unavailing.

Having found the commonality requirement satisfied with respect to Walter's on-call break theory, the Court turns to the predominance requirement of Rule 23(b)(3).  As previously stated, a central common question regarding this theory is whether Leprino's uniform policies and practices effectively resulted in employees being placed on call during breaks.  The Court finds that the common question predominates over individualized inquires because answering this common question does not require a great deal of individualized proof but can instead be done with the aforementioned facility-wide policies and practices.  <u>Howell</u>, 2022 U.S. Dist. LEXIS 52796, at *33-*34.  Leprino contends that individualized questions predominate because individualized inquiries are necessary to determine each putative class member's interpretation and understanding of the aforementioned policies, and whether the putative class members were still under Leprino's control during break time.  The Court disagrees.  Leprino's argument is unavailing because the Court has already found that Walter's alleged policies and practices are sufficiently facility-wide.  Walter presented sufficient objective evidence that Leprino's policies and practices regarding product quality, responsiveness to supervisors, carrying radios, and intercom use collectively create a common question, and this common question predominates over individualized inquiries into the members' subjective understanding of these policies and practices.

In sum, the Court concludes that Walter's on-call break claims satisfy the commonality and predominance requirements of Rule 23(a) and Rule 23(b)(3).

1          4.  <u>On-Duty Meal Period Claim</u>

2          An on-duty meal period is one in which an employee is not "relieved of all duty" for the

3   entire 30-minute period.  <u>Brinker</u>, 53 Cal. 4th at 1035.  An off-duty meal period, therefore, is one

4   in which the employee "is relieved of all duty during [the] 30 minute meal period."  <u>Id.</u>  Absent

5   circumstances permitting an on-duty meal period, an employer's obligation is to provide an off-

6   duty meal period: an uninterrupted 30-minute period during which the employee is relieved of all

7   duty.  <u>Id.</u>  An 'on duty' meal period shall be permitted only when the nature of the work prevents

8   an employee from being relieved of all duty and when by written agreement between the parties an

9   on-the-job paid meal period is agreed to.  <u>Id.</u>  The written agreement shall state that the employee

10  may, in writing, revoke the agreement at any time.  <u>Id.</u>

11         Walter argues that there is nothing about the nature of the work that prevents the putative

12  class members from being relieved for a proper break.  Therefore, to the extent there are putative

13  class members who worked pursuant to a straight eight-hour shift under an on-duty meal period

14  agreement, common questions exist as to whether the on-duty meal period agreement violated

15  California law.  In response, Leprino asserts that the only evidence Plaintiff submitted in support

16  of his on-duty meal period claim is an unsigned, undated on-duty meal period agreement form

17  without any evidence of a putative class member working a "straight 8" shift or entering into an

18  on-duty meal period agreement.

19         Upon review, the Court finds that Walter has provided no evidence showing that on-duty

20  meal period agreements were common across the putative class.  Without such evidence, the

21  question of whether Leprino utilized improper on-duty meal period agreements will involve

22  individualized inquiries into each putative class member that will predominate over common

23  questions.  Therefore, Plaintiff has not satisfied the commonality and predominance requirements

24  of Rule 23(a) and Rule 23(b)(3) for his on-duty meal period claim.

25         **G.    Superiority**

26         Certification under Rule 23(b)(3) also requires a finding that "a class action is superior to

27  other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P.

28  23(b)(3).  To evaluate superiority, the court shall consider four "pertinent" factors: (1) the class

1  members' interests in individually controlling the prosecution or defense of separate actions; (2)

2  the extent and nature of any litigation concerning the controversy already begun by or against

3  class members; (3) the desirability or undesirability of concentrating the litigation of the claims in

4  the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P.

5  23(b)(3)(A)–(D).  "A consideration of these factors requires the court to focus on the efficiency

6  and economy elements of the class action so that cases allowed under subdivision (b)(3) are those

7  that can be adjudicated most profitably on a representative basis."  Zinser v. Accufix Research

8  Inst., Inc., 253 F.3d 1180, 1190 (9th Cir. 2001) (citation omitted).  "A class action is the superior

9  method for managing litigation if no realistic alternative exists."  Valentino v. Carter–Wallace,

10 Inc., 97 F.3d 1227, 1234 (9th Cir. 1996).  In contrast, "[i]f each class member has to litigate

11 numerous and substantial separate issues to establish his or her right to recover individually a class

12 action is not superior."  Zinser, 253 F.3d at 1192.

13      Here, with respect to Walter's late and short meal break claim, the Court finds the Rule

14 23(b)(3) superiority factors weigh in favor of certification.  There is no indication of putative class

15 members wanting to assert late and short meal break claims in separate actions.  Nor is there

16 indication of other actions raising the same issues based on the same facts pertaining to Leprino's

17 Tracy facility.  There is also no indication here that managing Walter's late and short meal break

18 claim as a class action would be unmanageable.  To the contrary, this claim seems particularly apt

19 for class adjudication through use of meal period time punch records and data in Leprino's

20 possession.  See Kamar v. Radio Shack Corp., 254 F.R.D. 387, 405 (C.D. Cal. 2008) (finding that

21 inquiries into class members' actual wages would be relatively manageable because defendant's

22 payroll records contain that data).  Finally, class litigation is superior here for Walter's late and

23 short meal break claim, as it often is in wage-and-hour lawsuits, because "the individual damages

24 of each employee are too small to make litigation costs effective."  Wright v. Renzenberger, Inc.,

25 2017 U.S. Dist. LEXIS 225209, *36 (C.D. Cal. 2017).

26      However, with respect to Walter's on-call break claims, the Court has concerns under Rule

27 23(b)(3)(B) regarding the extent and nature of the *Howell* litigation concerning the controversy

28 already begun by hourly employees of the Tracy facility against Leprino.  See Howell, 2022 U.S.

1     Dist. LEXIS 52796, at *37 (certifying Howell's on-call break claims against Leprino on behalf of

2     non-exempt hourly employees at Leprino's Tracy plant).  Rule 23(b)(3)(B) is "intended to serve

3     the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits."

4     Zinser, 253 F.3d at 1191.  If the court finds that several other actions already are pending and that

5     a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action

6     may not be appropriate since, unless the other suits can be enjoined, a Rule 23 proceeding only

7     might create one more action.  Id.  Rather than allowing the class action to go forward, the court

8     may encourage the class members who have instituted the Rule 23(b)(3) action to intervene in the

9     other proceedings.  Id.

10         Here, Plaintiff does not deny that Howell involves the same on-call break claims asserted

11     against Leprino on behalf of non-exempt hourly employees at the same Tracy facility.  In fact,

12     Plaintiff frequently cited Howell in this matter to show that the two cases involve the same facts

13     and on-call break claims.  The only difference between Howell and the instant case regarding the

14     defined class is that the class period in Howell is from April 24, 2014 to March 22, 2022 while the

15     class period here is from February 28, 2016 to August 29, 2022.[9]  In other words, the only portion

16     of the class period here that does not overlap with the class period in Howell is from March 23,

17     2022 to August 29, 2022.  Walter did not work for Leprino during this approximately five-month

18     period; he worked for Leprino from December 2018 to October 2021, which falls completely

19     under the class period set in Howell.  Doc. No. 32-4 at 66.  The Court also notes that Plaintiff

20     submitted largely the same declarations and deposition testimonies of putative class members in

21     this case as the class representative did in the Howell case.  Counsel for plaintiffs in this case and

22     the Howell case are also the same.  In light of the above, the Court finds that the maintenance of

23     Walter's on-call break claims as a class action would be duplicative and inconsistent with the

24     objectives of Rule 23(b)(3).  See Soares v. Flowers Foods, Inc., 320 F.R.D. 464, 485 (N.D. Cal.

25

26    [9] The class in Howell is defined as "All non-exempt hourly workers who are currently employees, or formerly have
been employed, as non-exempt hourly employees at Leprino's Tracy plant in Tracy, California, at any time within
27    four years prior to the filing of the original complaint [April 24, 2014] until the date the Court grants certification
[March 22, 2022]." See Howell, 2022 U.S. Dist. LEXIS 52796, at *37.  Here, as mentioned above, the proposed class
is defined as "All non-exempt hourly workers who are currently employed, or formerly have been employed, as non-
28    exempt hourly employees at Leprino's Tracy plant in Tracy, California, at any time within four years prior to the
filing of the original complaint [February 28, 2016] until August 29, 2022."

2017) (denying class certification because the "clear threat of multiplicity and inconsistent adjudications" that the Ninth Circuit warned against was present in that there was a separate case of consolidated individual claims by putative class members against the same defendant); Shasta Linen Supply v. Applied Underwriters, Inc., 2019 U.S. Dist. LEXIS 14286, *15 (E.D. Cal. Jan. 28, 2019) ("If the court finds that several other actions are pending and that a threat of inconsistent adjudications exist, a class action may not be appropriate."); see also Becker v. Schenley Indus., Inc., 557 F.2d 346, 348 (2d Cir. 1977) (concluding that "the maintenance of the instant case as a class action would be duplicative and inconsistent with the objectives of Fed. R. Civ. P. 23(b)(3)" because class action status had already been granted in another case); Kinkead v. Humana at Home, Inc., 330 F.R.D. 338, 356 (D. Conn. 2019) ("[C]ourts may, in their discretion, deny certification to avoid duplicative class actions."); Schucker v. Flowers Foods, Inc., 2017 U.S. Dist. LEXIS 136178, *12 (S.D.N.Y. Aug. 24, 2017) ("[T]here is no question that in the class action context, a trial court's discretion to deny certification 'has continually been upheld where . . . it has been exercised so as to avoid duplicative class actions.'") (citing Becker, 557 F.2d at 348). Therefore, the Court finds that Walter's on-call break claims do not satisfy the Superiority element of Rule 23(b)(3) and will not be certified.[10]

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.     Walter's certification motion (Doc. No. 32) is GRANTED IN PART and DENIED IN PART as follows:

    a.     Walter's late and short meal break claim is CERTIFIED for class aggregation under Rule 23(b)(3);

    b.     Walter's on-call breaks claims are NOT CERTIFIED for class aggregation under Rule 23;

    c.     Walter's on-duty meal period claim is NOT CERTIFIED for class aggregation under Rule 23;

---

[10] Even if the Court certified Walter's on-call break claims for only the time period between March 23, 2022 to August 29, 2022, Walter did not work for Leprino during this time period and, therefore, his putative role as class representative would present adequacy and standing concerns.

d.    Walter's pre-shift rounding claim is NOT CERTIFIED for class aggregation under Rule 23;

e.    The class is defined as follows:

> All non-exempt hourly workers who are currently employed, or formerly have been employed, as non-exempt hourly employees at Leprino's Tracy plant in Tracy, California, at any time within four years prior to the filing of the original complaint until August 29, 2022.

f.    Fred Walter is APPOINTED as the class representative.

g.    The Parris Law Firm and The Downey Law Firm are APPOINTED as class counsel;

2.    Leprino's Request for Court Guidance (Doc. No. 58) is DENIED;

3.    The parties must promptly MEET AND CONFER about the submission of a joint stipulated class notice and distribution plan.  Within twenty-one (21) days of this order, the parties must FILE either a stipulated class notice and distribution plan or a notice that no stipulation can be agreed to.  If the parties cannot agree to a class notice or distribution plan, then Walter must FILE a proposed class notice and distribution plan within thirty-five (35) days of this order, and Leprino shall have fourteen (14) days following Walter's filing to FILE any objections, and Walter shall have seven (7) days following Leprino's filing to FILE a reply; and

3.    This case is REFERRED BACK to the assigned magistrate judge for further scheduling and other proceedings consistent with this order.

IT IS SO ORDERED.

Dated:   April 24, 2023                                 

SENIOR DISTRICT JUDGE